SILVER, DOING BUSINESS AS MUNICIPAL SECURI-
TIES CO., ET AL. *v.* NEW YORK STOCK
EXCHANGE.

No. 150. Argued February 25–26, 1963.—
Decided May 20, 1963.

342

*David I. Shapiro* argued the cause and filed briefs for petitioners.

*A. Donald MacKinnon* argued the cause for respondent. With him on the brief were *Samuel L. Rosenberry* and *Edward J. Reilly, Jr.*

By special leave of Court, *Solicitor General Cox* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief was *Daniel M. Friedman.*

MR. JUSTICE GOLDBERG. delivered the opinion of the Court.

We deal here today with the question, of great importance to the public and the financial community, of whether and to what extent the federal antitrust laws apply to securities exchanges regulated by the Securities Exchange Act of 1934. More particularly, the ques-

tion is whether the New York Stock Exchange is to be held liable to a nonmember broker-dealer under the antitrust laws or regarded as impliedly immune therefrom when, pursuant to rules the Exchange has adopted under the Securities Exchange Act of 1934, it orders a number of its members to remove private direct telephone wire connections previously in operation between their offices and those of the nonmember, without giving the nonmember notice, assigning him any reason for the action, or affording him an opportunity to be heard.

## I.

The facts material to resolution of this question are not in dispute. Harold J. Silver, who died during the pendency of this action, entered the securities business in Dallas, Texas, in 1955, by establishing the predecessor of petitioner Municipal Securities (Municipal) to deal primarily in municipal bonds. The business of Municipal having increased steadily, Silver, in June 1958, established petitioner Municipal Securities, Inc. (Municipal, Inc.), to trade in corporate over-the-counter securities. Both firms are registered broker-dealers and members of the National Association of Securities Dealers, Inc. (NASD); neither is a member of the respondent Exchange.

Instantaneous communication with firms in the mainstream of the securities business is of great significance to a broker-dealer not a member of the Exchange, and Silver took steps to see that this was established for his firms. Municipal obtained direct private telephone wire connections with the municipal bond departments of a number of securities firms (three of which were members of the Exchange) and banks, and Municipal, Inc., arranged for private wires to the corporate securities trading departments of 10 member firms of the Exchange, as well as to the trading desks of a number of nonmember firms.

Pursuant to the requirements of the Exchange's rules, all but one of the member firms which had granted private wires to Municipal, Inc., applied to the Exchange for approval of the connections.[1] During the summer of 1958 the Exchange granted "temporary approval" for these, as well as for a direct teletype connection to a member firm in New York City and for stock ticker service to be furnished to petitioners directly from the floor of the Exchange.

On February 12, 1959, without prior notice to Silver, his firms, or anyone connected with them, the Exchange's Department of Member Firms decided to disapprove the private wire and related applications. Notice was sent to the member firms involved, instructing them to discontinue the wires, a directive with which compliance was required by the Exchange's Constitution and rules. These firms in turn notified Silver that the private wires would have to be discontinued, and the Exchange advised him directly of the discontinuance of the stock ticker service. The wires and ticker were all removed by the beginning of March. By telephone calls, letters, and a personal trip to New York, Silver sought an explanation from the Exchange of the reason for its decision, but was repeatedly told it was the policy of the Exchange not to disclose the reasons for such action.[2]

Petitioners contend that their volume of business dropped substantially thereafter and that their profits fell, due to a combination of forces all stemming from the

---

[1] Exchange approval was never sought for Municipal's private wires to the municipal bond departments of member firms.

[2] Ultimately, during the pretrial stages of this litigation, the Exchange disclosed most of the reasons for its action, and these are summarized and discussed in the opinions of both the District Court, 196 F. Supp. 209, 216–217, 225–227, and the Court of Appeals, 302 F. 2d 714, 716. In view, however, of the disposition we make of the case hereafter, there is no need to set forth these reasons in detail in this opinion.

removal of the private wires—their consequent inability to obtain quotations quickly, the inconvenience to other traders in calling petitioners, and the stigma attaching to the disapproval. As a result of this change in fortunes, petitioners contend, Municipal, Inc., soon ceased functioning as an operating business organization, and Municipal has remained in business only on a greatly diminished scale.

The present litigation was commenced by Silver as proprietor of Municipal and by Municipal, Inc., against the Exchange in April 1959, in the Southern District of New York.[3] Three causes of action were asserted. The first, seeking an injunction and treble damages,[4] alleged that the Exchange had, in violation of §§ 1 and 2 of the Sherman Act, conspired with its member firms to deprive petitioners of their private wire connections and stock ticker service. The second alleged that the Exchange had tortiously induced its member firms to breach their contracts for wire connections with petitioners, and the third asserted that the Exchange's action constituted a tort of intentional and wrongful harm inflicted without reasonable cause.

Petitioners moved for summary judgment on the antitrust claim, and for an accompanying permanent injunction against the Exchange's coercion of its members into refusing to provide private wire connections and against the Exchange's refusal to reinstate the stock ticker service. The district judge, after considering the respective affidavits of the parties, granted summary judgment and a permanent injunction as to the private wire connections, 196 F. Supp. 209, holding that the antitrust

---

[3] Silver died while the case was pending in the Court of Appeals, and his widow, Evelyn B. Silver, as executrix of his estate, was substituted for him.

[4] These forms of relief are provided by §§ 4 and 16 of the Clayton Act, 15 U. S. C. §§ 15, 26.

laws applied to the Exchange, and that its directive and the ensuing compliance by its members constituted a collective refusal to continue the wires and was a *per se* violation of § 1 of the Sherman Act. The judge so held on the basis that, although the Exchange had the power to regulate the conduct of its members in dealing with listed securities, its members' relations with nonmembers with regard to over-the-counter securities were not sufficiently germane to the fulfillment of its duties of self-regulation under the Securities Exchange Act to warrant its being excused from having to answer for restraints of trade such as occurred here by removal of the private wires. He left the issues of treble damages and costs to a later trial. With reference to the stock ticker service, the judge held that there were triable issues of fact as to whether the Exchange's action could be considered to have been the concerted action of its members and as to whether, if the Exchange was to be regarded as having acted by itself, any violation of § 2 of the Sherman Act had occurred. He therefore denied summary judgment as to that aspect of petitioners' claims.

On the Exchange's appeal from the grant of partial summary judgment, the United States Court of Appeals for the Second Circuit reversed over the dissent of one judge. 302 F. 2d 714. The court held that the Securities Exchange Act "gives the Commission and the Exchange disciplinary powers over members of the Exchange with respect to their transactions in over-the-counter securities, and that the policy of the statute requires that the Exchange exercise these powers fully." *Id.,* at 720. This meant that "the action of the Exchange in bringing about the cancellation of the private wire connections . . . was within the general scope of the authority of the Exchange as defined by the 1934 Act," *id.,* at 716, and dictated a conclusion that "[t]he Exchange is exempt from the restrictions of the Sherman Act because it is exercising a

power which it is required to exercise by the Securities Exchange Act," *id.*, at 721. The court, however, did not exclude the possibility that the Exchange might be liable on some other theory, and remanded the case for consideration of petitioners' second and third causes of action.

This Court granted certiorari. 371 U. S. 808. What is before us is only so much of the first cause of action as relates to the collective refusal to continue the private wire connections, since petitioners did not attempt to appeal from the denial of summary judgment as to the portion relating to the discontinuance of the stock ticker service. Summary judgment was never sought as to the second and third causes of action, hence those are also not in issue at the present time.

## II.

The fundamental issue confronting us is whether the Securities Exchange Act has created a duty of exchange self-regulation so pervasive as to constitute an implied repealer of our antitrust laws, thereby exempting the Exchange from liability in this and similar cases.

### A.

It is plain, to begin with, that removal of the wires by collective action of the Exchange and its members would, had it occurred in a context free from other federal regulation, constitute a *per se* violation of § 1 of the Sherman Act. The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market. *Fashion Originators' Guild* v. *Federal Trade Comm'n*, 312 U. S. 457; *Associated Press* v. *United States*, 326 U. S. 1; *Klor's, Inc.*, v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207; *Radiant Burners, Inc.*, v. *Peoples Gas Light & Coke Co.*,

364 U. S. 656. Unlike listed securities, there is no central trading place for securities traded over the counter. The market is established by traders in the numerous firms all over the country through a process of constant communication to one another of the latest offers to buy and sell. The private wire connection, which allows communication to occur with a flip of a switch, is an essential part of this process. Without the instantaneously available market information provided by private wire connections, an over-the-counter dealer is hampered substantially in his crucial endeavor—to buy, whether it be for customers or on his own account, at the lowest quoted price and sell at the highest quoted price. Without membership in the network of simultaneous communication, the over-the-counter dealer loses a significant volume of trading with other members of the network which would come to him as a result of his easy accessibility. These important business advantages were taken away from petitioners by the group action of the Exchange and its members. Such "concerted refusals by traders to deal with other traders . . . have long been held to be in the forbidden category," *Klor's, Inc.,* v. *Broadway-Hale Stores, Inc.,* 359 U. S., at 212, of restraints which "because of their inherent nature or effect . . . injuriously restrained trade," *United States* v. *American Tobacco Co.,* 221 U. S. 106, 179.[5] Hence, absent any justification derived from the policy of another statute

---

[5] The fact that the consensus underlying the collective action was arrived at when the members bound themselves to comply with Exchange directives upon being admitted to membership rather than when the specific issue of Silver's qualifications arose does not diminish the collective nature of the action. A blanket subscription to possible future restraints does not excuse the restraints when they occur. *Associated Press* v. *United States,* 326 U. S. 1. Nor does any excuse derive from the fact that the collective refusal to deal was only with reference to the private wires, the member firms remaining willing to deal with petitioners for the purchase and sale

or otherwise, the Exchange acted in violation of the Sherman Act. In this case, however, the presence of another statutory scheme, that of the Securities Exchange Act of 1934, means that such a conclusion is only the beginning, not the end, of inquiry.

### B.

The difficult problem here arises from the need to reconcile pursuit of the antitrust aim of eliminating restraints on competition with the effective operation of a public policy contemplating that securities exchanges will engage in self-regulation which may well have anti-competitive effects in general and in specific applications.

The need for statutory regulation of securities exchanges and the nature of the duty of self-regulation imposed by the Securities Exchange Act are properly understood in the context of a consideration of both the economic role played by exchanges and the historical setting of the Act. Stock exchanges perform an important function in the economic life of this country. They serve, first of all, as an indispensable mechanism through which corporate securities can be bought and sold. To corporate enterprise such a market mechanism is a fundamental element in facilitating the successful marshaling of large aggregations of funds that would otherwise be extremely difficult of access. To the public the exchanges are an investment channel which promises ready convertibility of stock holdings into cash. The importance

---

of securities. See *Bigelow* v. *RKO Radio Pictures, Inc.*, 327 U. S. 251; *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 167. A valuable service germane to petitioners' business and important to their effective competition with others was withheld from them by collective action. That is enough to create a violation of the Sherman Act. *United States* v. *Terminal R. Assn. of St. Louis*, 224 U. S. 383; *United States* v. *First National Pictures, Inc.*, 282 U. S. 44; *Associated Press* v. *United States, supra;* cf. *Anderson* v. *United States,* 171 U. S. 604, 618–619.

of these functions in dollar terms is vast—in 1962 the New York Stock Exchange, by far the largest of the 14 exchanges which are registered with the Securities and Exchange Commission, had $47.4 billion of transactions in stocks, rights, and warrants (a figure which represented 86% of the total dollar volume on registered exchanges). Report of the Special Study of Securities Markets (1963), c. IB, p. 6.[6] Moreover, because trading on the exchanges, in addition to establishing the price level of listed securities, affects securities prices in general, and because such transactions are often regarded as an indicator of our national economic health, the significance of the exchanges in our economy cannot be measured only in terms of the dollar volume of trading. Recognition of the importance of the exchanges' role led the House Committee on Interstate and Foreign Commerce to declare in its report preceding the enactment of the Securities Exchange Act of 1934 that "The great exchanges of this country upon which millions of dollars of securities are sold are affected with a public interest in the same degree as any other great utility." H. R. Rep. No. 1383, 73d Cong., 2d Sess. 15 (1934).

The exchanges are by their nature bodies with a limited number of members, each of which plays a certain role in the carrying out of an exchange's activities. The limited-entry feature of exchanges led historically to their being

---

[6] The report cited in the text is the recently issued first segment of a study which the Commission was directed to make by a 1961 amendment to the Securities Exchange Act, § 19 (d), 15 U. S. C. (Supp. III) § 78s (d). Another set of figures reported by the Special Study illustrates the great importance of corporate securities as a form of private property. As of the end of 1961, individuals had net financial savings of about $900,000,000,000, of which direct holdings of corporate securities amounted to more than half. In addition, life insurance companies and private pension funds held about $93,000,-000,000 in corporate securities, and personal trust funds held another $57,000,000,000. Special Study, c. IB, pp. 2–3.

treated by the courts as private clubs, *Belton* v. *Hatch*, 109 N. Y. 593, 17 N. E. 225 (1888), and to their being given great latitude by the courts in disciplining errant members, see Westwood and Howard, Self-Government in the Securities Business, 17 Law and Contemp. Prob. 518–525 (1952). As exchanges became a more and more important element in our Nation's economic and financial system, however, the private-club analogy became increasingly inapposite and the ungoverned self-regulation became more and more obviously inadequate, with acceleratingly grave consequences. This impotency ultimately led to the enactment of the 1934 Act. The House Committee Report summed up the long-developing problem in discussing the general purposes of the bill:

> "The fundamental fact behind the necessity for this bill is that the leaders of private business, whether because of inertia, pressure of vested interests, lack of organization, or otherwise, have not since the war been able to act to protect themselves by compelling a continuous and orderly program of change in methods and standards of doing business to match the degree to which the economic system has itself been constantly changing . . . . The repetition in the summer of 1933 of the blindness and abuses of 1929 has convinced a patient public that enlightened self-interest in private leadership is not sufficiently powerful to effect the necessary changes alone—that private leadership seeking to make changes must be given Government help and protection." H. R. Rep. No. 1383, *supra*, at 3.

It was, therefore, the combination of the enormous growth in the power and impact of exchanges in our economy, and their inability and unwillingness to curb abuses which had increasingly grave implications because of this growth, that moved Congress to enact the Securities Exchange Act

352

of 1934. S. Rep. No. 792, 73d Cong., 2d Sess. 2–5 (1934);
H. R. Rep. No. 1383, *supra,* at 2–5.

The pattern of governmental entry, however, was by
no means one of total displacement of the exchanges'
traditional process of self-regulation. The intention was
rather, as MR. JUSTICE DOUGLAS said, while Chairman of
the S. E. C., one of "letting the exchanges take the leader-
ship with Government playing a residual role. Govern-
ment would keep the shotgun, so to speak, behind the
door, loaded, well oiled, cleaned, ready for use but with
the hope it would never have to be used." Douglas,
Democracy and Finance (Allen ed. 1940), 82. Thus the
Senate Committee Report stressed that "the initiative
and responsibility for promulgating regulations pertain-
ing to the administration of their ordinary affairs remain
with the exchanges themselves. It is only where they
fail adequately to provide protection to investors that
the Commission is authorized to step in and compel them
to do so." S. Rep. No. 792, *supra,* at 13. The House
Committee Report added the hope that the bill would
give the exchanges sufficient power to reform themselves
without intervention by the Commission. H. R. Rep.
No. 1383, *supra,* at 15. See also 2 Loss, Securities Regu-
lation (2d ed. 1961), 1175–1178, 1180–1182.

Thus arose the federally mandated duty of self-policing
by exchanges. Instead of giving the Commission the
power to curb specific instances of abuse, the Act placed
in the exchanges a duty to register with the Commission,
§ 5, 15 U. S. C. § 78e, and decreed that registration could
not be granted unless the exchange submitted copies of its
rules, § 6 (a)(3), 15 U. S. C. § 78f (a)(3), and unless such
rules were "just and adequate to insure fair dealing and
to protect investors," § 6 (d), 15 U. S. C. § 78f (d). The
general dimensions of the duty of self-regulation are sug-
gested by § 19 (b) of the Act, 15 U. S. C. § 78s (b), which
gives the Commission power to order changes in exchange

rules respecting a number of subjects, which are set forth in the margin.[7]

One aspect of the statutorily imposed duty of self-regulation is the obligation to formulate rules governing the conduct of exchange members. The Act specifically requires that registration cannot be granted "unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade . . . ," § 6 (b), 15 U. S. C. § 78f (b). In addition, the general requirement of § 6 (d) that an exchange's rules be "just and adequate to insure fair dealing and to protect investors" has obvious relevance to the area of rules regulating the conduct of an exchange's members.

The § 6 (b) and § 6 (d) duties taken together have the broadest implications in relation to the present problem, for members inevitably trade on the over-the-counter market in addition to dealing in listed securities,[8] and

---

[7] "The Commission is . . . authorized . . . to alter or supplement the rules of . . . [an] exchange . . . in respect of such matters as (1) safeguards in respect of the financial responsibility of members and adequate provision against the evasion of financial responsibility through the use of corporate forms or special partnerships; (2) the limitation or prohibition of the registration or trading in any security within a specified period after the issuance or primary distribution thereof; (3) the listing or striking from listing of any security; (4) hours of trading; (5) the manner, method, and place of soliciting business; (6) fictitious or numbered accounts; (7) the time and method of making settlements, payments, and deliveries and of closing accounts; (8) the reporting of transactions on the exchange and upon tickers maintained by or with the consent of the exchange, including the method of reporting short sales, stopped sales, sales of securities of issuers in default, bankruptcy or receivership, and sales involving other special circumstances; (9) the fixing of reasonable rates of commission, interest, listing, and other charges; (10) minimum units of trading; (11) odd-lot purchases and sales; (12) minimum deposits on margin accounts; and (13) similar matters."

[8] Member firms of the New York Stock Exchange accounted for over half of the total dollar volume of over-the-counter business in

such trading inexorably brings contact and dealings with nonmember firms which deal in or specialize in over-the-counter securities. It is no accident that the Exchange's Constitution and rules are permeated with instances of regulation of members' relationships with nonmembers including nonmember broker-dealers.[9] A member's purchase of unlisted securities for itself or on behalf of its customer from a boiler-shop operation [10] creates an ob-

---

fiscal 1961, Special Study, *op. cit., supra*, c. IB, pp. 17–18, and trading in over-the-counter stocks constituted 21.6% of the estimated gross income of member firms of the Exchange for the same period, *id.*, c. I, Table I–12.

[9] Of most significance in this connection is Art. XIV, § 17, of the Exchange's Constitution, which permits it to order a member to sever any business connection which might cause the interest or good repute of the Exchange to suffer, and Rules 331–335, which provide various specific regulations governing members' relations with nonmember corporations and associations (including broker-dealers) in which they have an ownership interest or with which they are otherwise connected. Equally important are Rule 403, prohibiting transaction of business with a bucket shop, and Rule 435, prohibiting participation in any manipulative operation. The subject of commissions to be collected from nonmembers is regulated by Article XV of the Constitution and by numerous rules. Arbitration involving nonmembers is dealt with by Art. VIII, §§ 1 and 6, of the Constitution. Various other rules prohibit the joint use of an office with a nonmember unless the Exchange approves (Rule 344), the giving of compensation or gratuities to the employees of nonmembers without their employer's consent (Rule 350), and the paying of certain expenses of nonmembers (Rule 369). Rule 418 permits the Exchange to engage in a "surprise" audit of any member who does business with nonmembers. And Art. III, § 6, of the Constitution and Rules 355 through 358 deal with private wire connections and related installations, see note 11, *infra*.

[10] In deposition, the assistant director of the Exchange's Department of Member Firms described a boiler shop as "usually a physically small operation which employs high pressure telephone salesmanship to oversell to the public by quantity, and in many cases by quality." He said that this kind of firm, as well as bucket shops, inadequately capitalized firms, and firms which might misrepresent or

vious danger of loss to the principal in the transaction, and sale of securities to a nonmember insufficiently capitalized to protect customers' rights creates similar risks. In addition to the potential financial injury to the investing public and Exchange members that is inherent in these transactions as well as in dealings with nonmembers who are unreliable for any other reason, all such intercourse carries with it the gravest danger of engendering in the public a loss of confidence in the Exchange and its members, a kind of damage which can significantly impair fulfillment of the Exchange's function in our economy. Rules which regulate Exchange members' doing of business with nonmembers in the over-the-counter market are therefore very much pertinent to the aims of self-regulation under the 1934 Act. Transactions with nonmembers under the circumstances mentioned can only be described as "inconsistent with just and equitable principles of trade," and rules regulating such dealing are indeed "just and adequate to insure fair dealing and to protect investors."

The Exchange's constitutional provision and rules relating to private wire connections [11] are unquestionably part

---

withhold material facts from customers, was among those which the Exchange seeks to prevent from having the use of its facilities.

[11] Article III, § 6, of the Constitution, which is entitled "Supervision Over Members, Allied Members, Member Firms and Member Corporations," provides, among other things, that the Exchange "shall have power to approve or disapprove any application for ticker service to any non-member, or for wire, wireless, or other connection between any office of any member of the Exchange, member firm or member corporation and any non-member, and may require the discontinuance of any such service or connection." Rule 355 provides, "(a) No member or member organization shall establish or maintain any wire connection, private radio, television or wireless system between his or its offices and the office of any non-member, or permit any private radio or television system between his or its offices, without prior consent of the Exchange. (b) Every nonmember will be required to execute a private wire contract in form

of this fulfillment of the § 6 (b) and § 6 (d) duties, for such wires between members and nonmembers facilitate trading in and exchange of information about unlisted securities, and such contact with an unreliable nonmember not only may further his business undesirably, but may injure the member or the member's customer on whose behalf the contact is made and ultimately imperil the future status of the Exchange by sapping public confidence. In light of the important role of exchanges in our economy and the 1934 Act's design of giving the exchanges a major part in curbing abuses by obligating them to regulate themselves, it appears conclusively—contrary to the District Court's conclusion—that the rules applied in the present case are germane to performance of the duty, implied by § 6 (b) and § 6 (d), to have rules governing members' transactions and relationships with nonmembers. The Exchange's enforcement of such rules inevitably affects the nonmember involved, often (as here) far more seriously than it affects the members in question. The sweeping of the nonmembers into the currents of the Exchange's process of self-regulation is therefore unavoidable; the case cannot be disposed of by holding as the

prescribed by the Exchange to be filed with it, unless a contract is already on file with the Exchange. (c) Notification regarding a private means of communication with a non-member and the signed contract when necessary shall be submitted to the Department of Member Firms. This notification, by a member or allied member, may be in form supplied by the Exchange or in letter form, and shall include the essential facts concerning the non-member and the means of communication. (d) Each member or member organization shall submit annually to the Department of Member Firms a list of all non-members with whom private means of communication are maintained. (e) The Exchange may require at any time that any means of communication be discontinued." Rule 356, insofar as relevant, provides, "The Exchange may require at any time the discontinuance of any means of communication whatsoever which has a terminus in the office of a member or member organization."

district judge did that the substantive act of regulation engaged in here was outside the boundaries of the public policy established by the Securities Exchange Act of 1934.

## C.

But, it does not follow that the case can be disposed of, as the Court of Appeals did, by holding that since the Exchange has a general power to adopt rules governing its members' relations with nonmembers, particular applications of such rules are therefore outside the purview of the antitrust laws. Contrary to the conclusions reached by the courts below, the proper approach to this case, in our view, is an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted.

The Securities Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication, and "[i]t is a cardinal principle of construction that repeals by implication are not favored." *United States* v. *Borden Co.,* 308 U. S. 188, 198; see *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 456–457; *California* v. *Federal Power Comm'n,* 369 U. S. 482, 485. Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes.

Although the Act gives to the Securities and Exchange Commission the power to request exchanges to make changes in their rules, § 19 (b), 15 U. S. C. § 78s (b), and impliedly, therefore, to disapprove any rules adopted by an exchange, see also § 6 (a)(4), 15 U. S. C. § 78f (a)(4), it does not give the Commission jurisdiction to review particular instances of enforcement of exchange rules. See 2 Loss, *op. cit., supra,* at 1178; Westwood and

Howard, *supra,* 17 Law & Contemp. Prob., at 525. This aspect of the statute, for one thing, obviates any need to consider whether petitioners were required to resort to the Commission for relief before coming into court. Compare *Georgia* v. *Pennsylvania R. Co.,* 324 U. S., at 455. Moreover, the Commission's lack of jurisdiction over particular applications of exchange rules means that the question of antitrust exemption does not involve any problem of conflict or coextensiveness of coverage with the agency's regulatory power. See *Georgia* v. *Pennsylvania R. Co., supra; United States* v. *Radio Corp. of America,* 358 U. S. 334; *California* v. *Federal Power Comm'n, supra; Pan American World Airways, Inc.,* v. *United States,* 371 U. S. 296.[12] The issue is only that of the extent to which the character and objectives of the duty of exchange self-regulation contemplated by the Securities Exchange Act are incompatible with the maintenance of an antitrust action. Compare *Maryland & Va. Milk Producers Assn.* v. *United States,* 362 U. S. 458.

The absence of Commission jurisdiction, besides defining the limits of the inquiry, contributes to its solution. There is nothing built into the regulatory scheme which performs the antitrust function of insuring that an exchange will not in some cases apply its rules so as to do injury to competition which cannot be justified as furthering legitimate self-regulative ends. By providing

---

[12] Were there Commission jurisdiction and ensuing judicial review for scrutiny of a particular exchange ruling, as there is under the 1938 Maloney Act amendments to the Exchange Act to examine disciplinary action by a registered securities association (*i. e.,* by the NASD), §§ 15A (g), 15A (h), 25 (a), 15 U. S. C. §§ 78o–3 (g), 78o–3 (h), 78y (a); see *R. H. Johnson & Co.* v. *Securities & Exchange Comm'n,* 198 F. 2d 690 (C. A. 2d Cir. 1952), cert. denied, 344 U. S. 855, a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity, an issue we do not decide today.

no agency check on exchange behavior in particular cases, Congress left the regulatory scheme subject to "the influences of . . . [improper collective action] over which the Commission has no authority but which if proven to exist can only hinder the Commission in the tasks with which it is confronted," *Georgia* v. *Pennsylvania R. Co.,* 324 U. S., at 460. See *United States* v. *Borden Co.,* 308 U. S., at 200; *Maryland & Va. Milk Producers Assn.* v. *United States,* 362 U. S., at 465–466. Enforcement of exchange rules, particularly those of the New York Stock Exchange with its immense economic power, may well, in given cases, result in competitive injury to an issuer, a nonmember broker-dealer, or another when the imposition of such injury is not within the scope of the great purposes of the Securities Exchange Act. Such unjustified self-regulatory activity can only diminish public respect for and confidence in the integrity and efficacy of the exchange mechanism. Some form of review of exchange self-policing, whether by administrative agency or by the courts, is therefore not at all incompatible with the fulfillment of the aims of the Securities Exchange Act. Only this year S. E. C. Chairman Cary observed that "some government oversight is warranted, indeed necessary, to insure that action in the name of self-regulation is neither discriminatory nor capricious." Cary, Self-Regulation in the Securities Industry, 49 A. B. A. J. 244, 246 (1963).[13] Since the antitrust laws serve, among other things, to protect competitive freedom, i. e., the freedom of individual business units to compete unhindered by the

---

[13] Although the recently issued first segment of the Report of the Special Study of Securities Markets is more critical of situations in the over-the-counter market and with reference to exchanges other than the respondent, it does point out that improper selling practices have occurred among member firms of respondent, c. IIIB, pp. 178–179, 183–184, and suggests the need for new Commission rules to govern selling practices of securities dealers, *id.,* p. 186.

group action of others, it follows that the antitrust laws are peculiarly appropriate as a check upon anticompetitive acts of exchanges which conflict with their duty to keep their operations and those of their members honest and viable. Applicability of the antitrust laws, therefore, rests on the need for vindication of their positive aim of insuring competitive freedom. Denial of their applicability would defeat the congressional policy reflected in the antitrust laws without serving the policy of the Securities Exchange Act. Should review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented. See note 12, *supra*.

Yet it is only frank to acknowledge that the absence of power in the Commission to review particular exchange exercises of self-regulation does create problems for the Exchange. The entire public policy of self-regulation, beginning with the idea that the Exchange may set up barriers to membership, contemplates that the Exchange will engage in restraints of trade which might well be unreasonable absent sanction by the Securities Exchange Act. Without the oversight of the Commission to elaborate from time to time on the propriety of various acts of self-regulation, the Exchange is left without guidance and without warning as to what regulative action would be viewed as excessive by an antitrust court possessing power to proceed based upon the considerations enumerated in the preceding paragraphs. But, under the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act. See *United States* v. *Terminal R. Assn. of St. Louis,* 224 U. S. 383, 394–395; *Board of Trade of the City of Chicago* v. *United States,* 246 U. S. 231, 238. Although, as we have seen, the statutory scheme of that Act is not sufficiently pervasive to create a total ex-

emption from the antitrust laws, compare Hale and Hale, Competition or Control VI: Application of Antitrust Laws to Regulated Industries, 111 U. of Pa. L. Rev. 46, 48, 57–59 (1962), it is also true that particular instances of exchange self-regulation which fall within the scope and purposes of the Securities Exchange Act may be regarded as justified in answer to the assertion of an antitrust claim.

## III.

The final question here is, therefore, whether the act of self-regulation in this case was so justified. The answer to that question is that it was not, because the collective refusal to continue the private wires occurred under totally unjustifiable circumstances. Notwithstanding their prompt and repeated requests, petitioners were not informed of the charges underlying the decision to invoke the Exchange rules and were not afforded an appropriate opportunity to explain or refute the charges against them.

Given the principle that exchange self-regulation is to be regarded as justified in response to antitrust charges only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act, it is clear that no justification can be offered for self-regulation conducted without provision for some method of telling a protesting nonmember why a rule is being invoked so as to harm him and allowing him to reply in explanation of his position. No policy reflected in the Securities Exchange Act is, to begin with, served by denial of notice and an opportunity for hearing. Indeed, the aims of the statutory scheme of self-policing—to protect investors and promote fair dealing—are defeated when an exchange exercises its tremendous economic power without explaining its basis for acting, for the absence of an obligation to give some form of notice and, if timely requested, a hearing creates a great danger of perpetration of injury that will damage public confidence in the exchanges. The re-

quirement of such a hearing will, by contrast, help in effectuating antitrust policies by discouraging anticompetitive applications of exchange rules which are not justifiable as within the scope of the purposes of the Securities Exchange Act. In addition to the general impetus to refrain from making unsupportable accusations that is present when it is required that the basis of charges be laid bare, the explanation or rebuttal offered by the nonmember will in many instances dissipate the force of the *ex parte* information upon which an exchange proposes to act. The duty to explain and afford an opportunity to answer will, therefore, be of extremely beneficial effect in keeping exchange action from straying into areas wholly foreign to the purposes of the Securities Exchange Act. And, given the possibility of antitrust liability for anticompetitive acts of self-regulation which fall too far outside the scope of the Exchange Act, the utilization of a notice and hearing procedure with its inherent check upon unauthorized exchange action will diminish rather than enlarge the likelihood that such liability will be incurred and hence will not interfere with the Exchange's ability to engage efficaciously in legitimate substantive self-regulation.[14] Provision of such a hearing will, moreover, con-

---

[14] The Exchange argues that total disclosure of the reasons for its action and of the sources of its information will subject it and its informants to a risk of being sued for defamation in many instances. This risk, however, is properly met by the flexibility inherent in the law of defamation in the concept of the conditional or qualified privilege. 1 Harper and James, The Law of Torts (1956), §§ 5.21, 5.25, 5.26, especially § 5.26, at 442, n. 3. In addition, even if a particular communication of information to the Exchange should fall outside the scope of such a privilege, the Exchange can protect itself and its informant from expansion of damage liability by confining the hearing, unless otherwise requested by the aggrieved nonmember, to the parties to the dispute and the necessary witnesses, so as to limit the area of dissemination of the defamatory matter. See 1 Harper and James, *op. cit., supra*, § 5.30, at 469. Similarly, any concern that our holding exposes the Exchange to excessive liability for past

tribute to the effective functioning of the antitrust court, which would be severely impeded in providing the review of exchange action which we deem essential if the exchange could obscure rather than illuminate the circumstances under which it has acted. Hence the affording of procedural safeguards not only will substantively encourage the lessening of anticompetitive behavior outlawed by the Sherman Act but will allow the antitrust court to perform its function effectively.[15]

---

enforcement of its rules accomplished without a hearing ignores the presumable applicability of familiar principles of waiver, laches, and estoppel to bar relief to a nonmember who failed to make timely and appropriate protest to the Exchange.

[15] The affording of procedural safeguards will not burden the New York Stock Exchange; notice and hearing are already guaranteed by its Constitution, Art. XIV, § 14, to any member accused of violating its rules. The existence of these guarantees goes far toward dispelling fears that provision of a hearing to nonmembers would interfere significantly with the need for timely Exchange action, for it can surely be assumed that prompt action is as much required to deal with member wrongdoing as with that of a nonmember. We have no doubt, moreover, that provision of a hearing to a protesting nonmember can, when circumstances require, be accomplished expeditiously enough to prevent injury to investors. Indeed, if the basis for invocation of an Exchange rule is also a violation of the Securities Act of 1933, the Securities Exchange Act of 1934, or the Commission's rules and regulations under either statute, the Commission can come to the aid of the Exchange by obtaining a preliminary or permanent injunction or restraining order against such practice in the appropriate United States District Court. Securities Act of 1933, § 20 (b), 15 U. S. C. § 77t (b); Securities Exchange Act of 1934, § 21 (e), 15 U. S. C. § 78u (e). It is significant, however, that the Commission's power to obtain restraint of particular violations is confined to traditional judicial channels with the safeguards implied thereby, and that when the Commission, pursuant to the powers conferred on it by Congress in the Maloney Act of 1938, wishes to resort to the more drastic sanction of suspending or revoking the membership in the NASD of a wrongdoing over-the-counter dealer, it may only do so "after appropriate notice and opportunity for hearing . . . ." § 15A (l), 15 U. S. C. § 78o-3(l).

Our decision today recognizes that the action here taken by the Exchange would clearly be in violation of the Sherman Act unless justified by reference to the purposes of the Securities Exchange Act, and holds that that statute affords no justification for anticompetitive collective action taken without according fair procedures.[16] Congress in effecting a scheme of self-regulation designed to insure fair dealing cannot be thought to have sanctioned and protected self-regulative activity when carried out in a fundamentally unfair manner.[17] The point is not that the antitrust laws impose the requirement of

---

[16] It may be assumed that the Securities and Exchange Commission would have had the power, under § 19 (b) of the Exchange Act, 15 U. S. C. § 78s (b), pp. 352–353, 357 & note 7, *supra,* to direct the Exchange to adopt a general rule providing a hearing and attendant procedures to nonmembers. However, any rule that might be adopted by the Commission would, to be consonant with the antitrust laws, have to provide as a minimum the procedural safeguards which those laws make imperative in cases like this. Absent Commission adoption of a rule requiring fair procedure, and in light of both the utility of such a rule as an antitrust matter and its compatibility with securities-regulation principles, see p. 361, *supra,* no incompatibility with the Commission's power inheres in announcement by an antitrust court of the rule. Compare *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines, Inc.,* 372 U. S. 714, 723–724.

[17] The basic nature of the rights which we hold to be required under the antitrust laws in the circumstances of today's decision is indicated by the fact that public agencies, labor unions, clubs, and other associations have, under various legal principles, all been required to afford notice, a hearing, and an opportunity to answer charges to one who is about to be denied a valuable right. *Goldsmith* v. *United States Board of Tax Appeals,* 270 U. S. 117; *Russell* v. *Duke of Norfolk,* [1949] 1 All E. R. 109 (C. A.); Fellman, Constitutional Rights of Association, in The Supreme Court Review, 1961 (Kurland ed.), 74, 104, 112–113; Developments in the Law—Judicial Control of Actions of Private Associations, 76 Harv. L. Rev. 983, 1026–1037 (1963); see authorities cited note 18, *infra;* cf. *Vitarelli* v. *Seaton,* 359 U. S. 535; *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO,* v. *McElroy,* 367 U. S. 886, 894–895; *Willner* v. *Committee on Character and Fitness, ante,* p. 96.

notice and a hearing here, but rather that, in acting without according petitioners these safeguards in re- sponse to their request, the Exchange has plainly exceeded the scope of its authority under the Securities Exchange Act to engage in self-regulation and therefore has not even reached the threshold of justification under that statute for what would otherwise be an antitrust viola- tion. Since it is perfectly clear that the Exchange can offer no justification under the Securities Exchange Act for its collective action in denying petitioners the private wire connections without notice and an opportunity for hearing, and that the Exchange has therefore violated § 1 of the Sherman Act, 15 U. S. C. § 1, and is thus liable to petitioners under §§ 4 and 16 of the Clayton Act, 15 U. S. C. §§ 15, 26, there is no occasion for us to pass upon the sufficiency of the reasons which the Exchange later assigned for its action.[18] Thus there is also no need for

---

[18] The principle that a private association's failure to afford pro- cedural safeguards may result in the imposition of damage liability without inquiry into whether the association's action lacked substan- tive basis is reflected in many state-court decisions, resting on various theories of liability. *Cason* v. *Glass Bottle Blowers Assn.*, 37 Cal. 2d 134, 231 P. 2d 6 (1951); *Lahiff* v. *Saint Joseph's Total Abstinence & Benevolent Soc.*, 76 Conn. 648, 57 A. 692 (1904); *Malmsted* v. *Minne- apolis Aerie*, 111 Minn. 119, 126 N. W. 486 (1910); *Johnson* v. *Inter- national of the United Brotherhood of Carpenters*, 52 Nev. 400, 288 P. 170 (1930), 54 Nev. 332, 16 P. 2d 658 (1932); *Brooks* v. *Engar*, 259 App. Div. 333, 19 N. Y. S. 2d 114 (1st Dept.), appeal dismissed, 284 N. Y. 767, 31 N. E. 2d 514 (1940); *Blek* v. *Wilson*, 145 Misc. 373, 259 N. Y. Supp. 443 (Sup. Ct. 1932), modified and aff'd, 237 App. Div. 712, 262 N. Y. Supp. 416 (1st Dept.), rev'd on other grounds, 262 N. Y. 253, 186 N. E. 692 (1933); *Glauber* v. *Patof*, 183 Misc. 400, 47 N. Y. S. 2d 762 (Sup. Ct. 1944), aff'd mem., 269 App. Div. 687, 54 N. Y. S. 2d 384 (1st Dept.), modified *per curiam* on other grounds, 294 N. Y. 583, 63 N. E. 2d 181 (1945); *O'Brien* v. *Papas*, 49 N. Y. S. 2d 521 (Sup. Ct. 1944); *Taxicab Drivers' Local Union No. 889* v. *Pittman*, 322 P. 2d 159 (Okla. 1957); *International Printing Pressmen & Assistants' Union* v. *Smith*, 145 Tex. 399, 198 S. W. 2d 729 (1946); *Leo* v. *Local Union No. 612 of International Union of*

us to define further whether the interposing of a substantive justification in an antitrust suit brought to challenge a particular enforcement of the rules on its merits is to be governed by a standard of arbitrariness, good faith, reasonableness, or some other measure. It will be time enough to deal with that problem if and when the occasion arises. Experience teaches, however, that the affording of procedural safeguards, which by their nature serve to illuminate the underlying facts, in itself often operates to prevent erroneous decisions on the merits from occurring. There is no reason to believe that the experience of the Exchange will be different from that of other institutions, both public and private. The benefits which a guarantee of procedural safeguards brings about are, moreover, of particular importance here. It requires but little appreciation of the extent of the Exchange's economic power and of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail as to every aspect of the Exchange's activities. What is basically at issue here is whether the type of partnership between government and private enterprise that marks the design of the Securities Exchange Act of 1934 can operate effectively to insure the maintenance of such standards in the long run.

*Operating Engineers,* 26 Wash. 2d 498, 174 P. 2d 523 (1946) (alternative holding). See also Developments in the Law, *supra,* 76 Harv. L. Rev., at 1087–1095; Note, Procedural "Due Process" in Union Disciplinary Proceedings, 57 Yale L. J. 1302 (1948). The precedents cited undoubtedly rest on a recognition that the according of fair procedures is of fundamental significance, that serious and irreversible economic injury may result from their denial in a context like that of the present case, and that a substantive inquiry after the fact cannot possibly succeed in accurately ascertaining retrospectively what the outcome would have been had the procedural safeguards been afforded in the first instance. The conditioning of relief for the procedural breach on a finding that a concomitant substantive breach occurred might well, therefore, result in an ultimate wrongful denial of recovery to a party in the position of petitioners here.

We have today provided not a brake upon the private partner executing the public policy of self-regulation but a balance wheel to insure that it can perform this necessary activity in a setting compatible with the objectives of both the antitrust laws and the Securities Exchange Act.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Clark concurs in the result on the grounds stated in the opinion of the District Court, 196 F. Supp. 209, and the dissenting opinion in the Court of Appeals, 302 F. 2d 714.

Mr. Justice Stewart, whom Mr. Justice Harlan joins, dissenting.

The Court says that the fundamental question in this case is "whether and to what extent the federal antitrust laws apply to securities exchanges regulated by the Securities Exchange Act of 1934." I agree that this is the issue presented, but with all respect it seems to me that the answer which the Court has given is both unsatisfactory and incomplete.

The Court begins by pointing out, correctly, that removal of the petitioners' wire connections by collective action of the Exchange and its members would constitute a violation of the Sherman Act, had it occurred in an ordinary commercial context.[1] The Court then reviews at length the purpose, scope, and structure of the Securities Exchange Act and holds, again correctly I think, that the

---

[1] See, *e. g., Radiant Burners, Inc.,* v. *Peoples Gas Light & Coke Co.,* 364 U. S. 656; *Klor's, Inc.,* v. *Broadway-Hale Stores, Inc.,* 359 U. S. 207; *Fashion Originators' Guild* v. *Federal Trade Comm'n,* 312 U. S. 457. It may be assumed, I think, that almost every exercise of an exchange's statutory duty of self-regulation would involve an actual or threatened concerted refusal to deal—a "group boycott."

substantive act of regulation engaged in here was inside "the boundaries of the public policy" established by the Exchange Act. The Court next reminds us, correctly, that the Exchange Act contains no express exemption from the antitrust laws, and that a stock exchange or its members might in some cases "apply its rules so as to do injury to competition which cannot be justified as furthering legitimate self-regulative ends."

So far, so good. The Court has fairly and thoroughly stated the competing considerations bearing upon the basic problem involved in this case. But then—in the last five pages of the Court's opinion—the nature of the problem seems suddenly to change. The case becomes one involving due process concepts of notice, confrontation, and hearing.

It may be that a hearing should be accorded a member or nonmember of an exchange, injured by the invocation of an exchange rule, in all cases. On the other hand, in view of the sophisticated, subtle, and highly technical nature of the problem of what are "just and equitable principles of trade," or because of the fragile and mercurial ingredients of public confidence in the securities markets, there might be cases in which the public interest would demand that at least preliminary disciplinary action be taken with swift effectiveness. These broad policy questions were, quite properly, neither briefed nor argued in the present case. They are questions well within the power of Congress and of the Securities and Exchange Commission to canvass and to resolve.[2] But they

---

[2] See *ante*, p. 364, note 16. Contrary to the Court's suggestion, there has not been a total absence of agency or legislative attention to the problems of the Exchange's disciplinary machinery. In § 19 (c) of the 1934 Act, Congress expressly ordered the Securities and Exchange Commission to study the exchanges' procedures for disciplining members and to report back on the need for further legislation. The Commission reported the following year, giving a detailed account of existing procedures and making specific recommendations for

are questions, I respectfully submit, which have only the most tangential bearing upon the issues now before us.

The Court says that because of the failure to accord "procedural safeguards" to the petitioners, the respondent Exchange is *ipso facto* liable to them under the antitrust laws. This means that a bucket-shop operator who had been engaged in swindling the public could collect treble damages from a stock exchange which had denied him

reform. H. R. Doc. No. 85, 74th Cong., 1st Sess. (Jan. 25, 1935). It advised against legislation, however, suggesting that the exchanges themselves be given the opportunity to adopt the recommendations voluntarily. The agency also undertook to continue its surveillance of such procedures and to report to Congress "such further recommendations as it may deem advisable in regard to exchange government." *Id.*, at 17. In its 1935 Annual Report, the Commission stated that the respondent Exchange, as well as many others, had voluntarily complied. 1 S. E. C. Ann. Rep. 20 (1935). The process of surveillance has continued. In 1938, a general overhaul of the respondent Exchange's constitution was effected by informal Commission action. See 2 Loss, Securities Regulation, 1179–1182. In 1941, the Commission's proposals for statutory amendments included a specific request to extend § 19 (b) rule-making authority over rules governing discipline of members. Report of the Securities and Exchange Commission on Proposals for Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934, House Committee Print, Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess. 40 (Aug. 7, 1941). The proposal was not acted upon. Exchange disciplinary procedures were again examined in recent congressional hearings concerning the operation of the stock market. The absence of review by the Commission in individual cases was noted, but representatives of the respondent Exchange also testified that all such actions are reported informally to the agency. A detailed account of the Exchange's present procedures was included in the record. Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. J. Res. 438, 87th Cong., 1st Sess. 107–113. These recent hearings have led to an exhaustive study of current stock market conditions, and completion of the resulting report by the Commission is imminent. See Securities Exchange Act of 1934, § 19 (d), added by 75 Stat. 465, as amended, 76 Stat. 247, 15 U. S. C. (Supp. IV) § 78s (d); S. E. C., Report of Special Study of Securities Markets (Apr. 3, 1963).

its wire connections without first according him notice and a hearing. For, as I understand the Court's opinion, the exchange would not be allowed to prove in this hypothetical antitrust case that the plaintiff *was* such a swindler, even though proof of that fact to an absolute certainty were available. This result seems to me completely to frustrate the purpose and policy of the Securities Exchange Act, and to bear no relevance to the purpose and policy of the antitrust laws. Even assuming that Congress agreed with the Court's notions of the appropriate procedures under the Exchange Act, I cannot believe that Congress would have provided an antitrust forum and private treble damage liability to enforce them.

Whether there has been a violation of the antitrust laws depends not at all upon whether or not the defendants' conduct was arbitrary. As this Court has said, "the reasonableness of the methods pursued by the combination to accomplish its unlawful object is no more material than would be the reasonableness of the prices fixed by unlawful combination." *Fashion Originators' Guild* v. *Federal Trade Comm'n*, 312 U. S. 457, 468.[3] Yet the Court today says that because the Exchange did not accord the petitioners what the Court considers "fair procedures" under the Exchange Act, the Exchange has therefore violated § 1 of the Sherman Act.

I think the Court errs in using the antitrust laws to serve ends they were never intended to serve—to enforce the Court's concept of fair procedures under a totally unrelated statute. I should have thought that the aftermath of *Duplex Printing Press Co.* v. *Deering*[4]

---

[3] The Court pointed out that "An elaborate system of trial and appellate tribunals exists, for the determination of whether a given garment is in fact a copy of a Guild member's design." 312 U. S., at 462–463. See also *Klor's, Inc.,* v. *Broadway-Hale Stores*, 359 U. S. 207, 212.

[4] 254 U. S. 443. See *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469; *United States* v. *Hutcheson*, 312 U. S. 219.

would have provided a sufficient lesson as to the unwisdom of such a broad and basically irrelevant use of the antitrust laws.

The purpose of the self-regulation provisions of the Securities Exchange Act was to delegate governmental power to working institutions which would undertake, at their own initiative, to enforce compliance with ethical as well as legal standards in a complex and changing industry. This self-initiating process of regulation can work effectively only if the process itself is allowed to operate free from a constant threat of antitrust penalties. To achieve this end, I believe it must be held that the Securities Exchange Act removes antitrust liability for any action taken in good faith to effectuate an exchange's statutory duty of self-regulation. The inquiry in each case should be whether the conduct complained of was for this purpose. If it was, that should be the end of the matter so far as the antitrust laws are concerned—unless, of course, some antitrust violation other than the mere concerted action of an exchange and its members is alleged.[5]

I would vacate the judgment of the Court of Appeals and remand the case to the District Court for further proceedings consistent with the views expressed in this dissenting opinion.

---

[5] For example, an exchange would be liable under the antitrust laws if it conspired with outsiders, or if it attempted to use its power to monopolize. *United States* v. *Borden Co.*, 308 U. S. 188; *Maryland & Va. Milk Producers Assn.* v. *United States*, 362 U. S. 458; *Allen Bradley Co.* v. *Local 3, IBEW*, 325 U. S. 797. Furthermore, individual members of an exchange would be liable if it were shown that they had conspired to use the exchange's machinery for the purpose of suppressing competition. Cf. *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439; *United States* v. *Pacific & Arctic Ry. & Nav. Co.*, 228 U. S. 87. Application of the antitrust laws to such conduct would rest on the presence of an independent violation, not, as the present case does, simply upon concerted activity by the exchange and its members.