**ABBOTT SECURITIES CORP. et al.,**
**Plaintiffs,**

v.

**NEW YORK STOCK EXCHANGE,**
**Defendant.**

**Civ. A. No. 1778-72.**

United States District Court,
District of Columbia.

Oct. 30, 1974.

Carl L. Shipley, Shipley, Akerman, Stein & Kaps, Washington, D. C., for plaintiff.

William E. Jackson, Washington, D. C., for defendant; Milbank, Tweed, Hadley & McCloy, New York City, of counsel.

## MEMORANDUM OPINION

WADDY, District Judge.

Plaintiffs, forty-seven independent broker-dealers in the securities industry, all members of the National Association of Securities Dealers and all non-members of the defendant New York Stock Exchange (Exchange), allege in their complaint that during the period from December 5, 1968 to April 2, 1972, defendant and its members conspired to deny and did deny to plaintiffs economic access to the floor of the exchange, by participating in a group boycott, in an attempt to monopolize the portfolio brokerage commission business. These actions, plaintiffs assert, are in violation of the provisions of the Sherman Anti-

trust Act, 15 U.S.C. §§ 1–7. Plaintiffs demand treble damages. Jurisdiction of this Court is based on the Clayton Act, 15 U.S.C. § 15 and 28 U.S.C. § 1337.

Prior to December 5, 1968, plaintiffs had economic access to the New York Stock Exchange securities market, even though they were not members. This access was made possible through a practice known as the "give-up". This practice enabled plaintiffs and other non-member securities dealers to earn substantial income through reciprocal business arrangements permitted by the Exchange and customer directions such as where a securities broker surrendered a portion of his commission on a transaction to another broker at the direction of the customer placing the order. The recipient broker was usually not connected with the particular transaction but was being compensated by an investment company customer for other services such as sales of mutual fund shares or research performed by the broker for the investment company. This practice was discontinued by the Exchange on December 5, 1969. On September 24, 1971, the Exchange adopted a new policy by agreeing to allow limited economic access to the Exchange market through a 40% non-member broker-dealer discount. This policy became effective April 2, 1972.

This case is presently before the Court on plaintiffs' motion for summary judgment on the issue of liability, their memoranda of points and authorities in support thereof, the opposition of defendant thereto, and defendant's cross-motion for summary judgment, and its memoranda of points and authorities in support thereof. Defendant has filed the affidavit of Donald L. Calvin, vice president in charge of defendant's government relations, and thirty-three exhibits thereto, in support of its motion and in opposition to plaintiffs' motion. The Court has heard oral arguments on these motions.

From a reading of the complaint and the other documents filed in the case it appears to the Court that plaintiffs seek to hold defendant liable under the antitrust laws on two grounds. First, plaintiffs allege that the totality of competitive restraints [1] imposed upon them during the period from December 5, 1968, the effective date of the Exchange's rule prohibiting customer-directed give-ups, until April 2, 1972, the date when the 40% non-member broker-dealer discount became effective, were unreasonable. Second, plaintiffs allege that it was the intention of defendant securities Exchange and its members to retain 100% of the brokerage commissions earned on institutional and investment company portfolio transaction brokerage orders by monopolizing the market, and that defendant and its members conspired to do so by participating in a group boycott and denying plaintiffs economic access to the Exchange floor during this period of time. Plaintiffs claim that defendants are liable as a matter of law.

Defendant bases its opposition and motion on three defenses. First, defendant contends that the rules which plaintiffs challenge, which rules had the cumulative effect of foreclosing economic access to the Exchange floor to non-member broker-dealers, constituted government mandated action to which the antitrust laws are inapplicable; second, that the Securities and Exchange Commission had review jurisdiction over the self-regulatory conduct being challenged, thereby immunizing the Exchange from antitrust liability; and third, that the conduct of the Exchange was reasonable and justified in response to an antitrust claim.[2]

1. These restraints included a non-member minimum commission schedule, which treated non-member broker-dealers and individual investors alike, and rules prohibiting rebates to non-members, commission-splitting with non-members, and customer-directed give-ups.

2. The Exchange asserts that it had a legitimate concern regarding the effect of § 3(a)(3) of the 1934 Act on a non-member broker-dealer discount, and that since the SEC was holding hearings on the matter, and exercising its jurisdiction, its delay in granting access was in deference to the regulatory approach.

■ It is the opinion of this Court that it lacks jurisdiction, sitting as an antitrust court, to determine the reasonableness of the totality of competitive restraints imposed upon plaintiffs during the time alleged, insofar as the Securities and Exchange Commission had the power to review such Exchange conduct. Gordon v. New York Stock Exchange, 498 F.2d 1303 (CA2 1974); Silver v. New York Stock Exchange, 373 U.S. 341, 358–361, 83 S.Ct. 1246, 10 L. Ed.2d 389 (1963). Since it is a fact that the issue of economic access for non-member broker-dealers is inextricably intertwined with the practice of fixing commission rates, see para. 8 of the first amended complaint; and see *Gordon, supra*, 498 F.2d at 1310, and further that the SEC had review jurisdiction of this conduct pursuant to § 19(b) of the 1934 Securities Exchange Act, we find, as a matter of law, that defendant is immune from the operation of the antitrust laws for this alleged conduct and that it is entitled to judgment as a matter of law in this regard.

■ However, we find that plaintiffs' second allegation of conduct on the part of the Exchange and its members, *i. e.*, that defendants and its members intended and conspired to retain 100% of the brokerage commissions earned on institutional and investment company portfolio transaction brokerage orders by monopolizing the market, is alleged conduct not reviewable by the SEC, and will, if proven, subject defendant to antitrust liability. Our Court of Appeals referred to the possibility of this type of liability attaching to an exchange in the case of Independent Broker-Dealers' Trade Association v. Securities and Exchange Commission, 142 U.S.App.D.C. 384, 442 F.2d 132 (1971).[3] In discussing the possibilities of an antitrust action based on exchange self-regulatory, anti-competitive conduct, the Court said:

> "It is conceivable that an antitrust action could be grounded on the consideration that in a particular case, notwithstanding a formal request by the SEC, the Exchange and its members had a choice and exercised discretion that were [sic] tainted by anti-competitive purpose and impact which could not be justified by the regulatory approach." 442 F.2d at 140 n.11.[4]

In *Independent Broker-Dealers' Trade Association*, plaintiffs sought judicial review of SEC action, *i. e.*, the action of the Commission in directing the New York Stock Exchange to promulgate a rule prohibiting customer-directed give-ups. Plaintiffs herein take the position that at the time the rule prohibiting customer-directed give-ups was promulgated, defendant considered giving them, and could have given them, direct access to the floor of the Exchange as was eventually done in April of 1972, but chose not to do so in an exercise of discretion "tainted by anti-competitive purpose and impact," *i. e.*, to retain 100% of the brokerage commissions. Defendant denies this allegation and asserts that its conduct was reasonable and "justified by the regulatory approach." Defendant's intent at the time the choice

---

3. Independent Broker-Dealers' Trade Association is the trade association of plaintiffs herein.

4. The majority in *Silver* recognized this type of liability, 373 U.S. at 358–361, 83 S.Ct. 1246, and Justice Stewart, dissenting as to the result reached by the majority, thought that this type of exchange conduct was a violation separate and distinct from the ordinary concerted action of an exchange. He said: ·
"For example, an exchange would be liable under the antitrust laws if it conspired with outsiders, or if it attempted to use its power to monopolize. [citations omitted] Furthermore, individual members of an exchange would be liable if it were shown that they had conspired to use the exchange's machinery for the purpose of suppressing competition. [citations omitted] Application of the antitrust laws to such conduct would rest on the presence of an independent violation, not, as the present case does, simply upon concerted activity by the exchange and its members." 373 U.S. at 371 n. 5, 83 S.Ct. at 1264.

was made is a question of fact to be determined by a trier of fact. Therefore we find that there exist genuine issues of material fact that preclude judgment as a matter of law for either party.