**THILL SECURITIES CORPORATION et al., Plaintiff–Appellant,**

v.

**The NEW YORK STOCK EXCHANGE, Defendant–Appellee,**

and

**The United States Securities and Exchange Commission, Intervening Defendant–Appellee.**

No. 79–2253.

United States Court of Appeals, Seventh Circuit.

Argued May 6, 1980.

Decided Oct. 20, 1980.

E. Campion Kersten, Milwaukee, Wis., for plaintiff–appellant.

Ralph Ferrara, Washington, D. C., William E. Jackson, New York City, for defendant–appellee.

Before PELL, Circuit Judge, NICHOLS, Associate Judge,[*] and CUDAHY, Circuit Judge.

PELL, Circuit Judge.

The plaintiff in this action, Thill Securities Corporation (Thill), is again before this court in its challenge to the New York Stock Exchange's now–revoked anti–rebate rule.[1] The rule actually was a part of the Exchange's rule which, prior to its repeal, fixed all commissions charged on the floor of the Exchange. The text of the entire rule, with the challenged portions italicized, provides:

> Sec. 1. Commissions shall be charged and collected upon the execution of all orders for the purchase or sale for the account of members or allied members or of parties not members or allied members of the Exchange, of securities admitted to

dealings upon the Exchange and these commissions shall be at rates not less than the rates in this Article prescribed; *and shall be net and free from any rebate, return, discount or allowance made in any shape or manner, or by any method or arrangement direct or indirect. No bonus or percentage or portion of a commission, whether such commission be at or above the rates herein established, or any portion of a profit except as may be specifically permitted by the Constitution or a rule adopted by the Board of Governors, shall be given, paid or allowed directly or indirectly, or as a salary or portion of a salary, to a clerk or person for business sought or procured for any member or allied member of the Exchange or member firm or member corporation.*

Article XV, § 1 of the Constitution of the New York Stock Exchange.

Thill's complaint was filed in the district court in 1963 and claimed that the anti–rebate rule violated Sections 1 and 2 of the Sherman Anti–trust Act, 15 U.S.C. §§ 1, 2, and Section 4 of the Clayton Anti–trust Act, 15 U.S.C. § 15. In August of 1969, the district court granted summary judgment against Thill, holding that the rule was a method of regulating commission rates and that the Securities and Exchange Commission (SEC) had sufficiently exercised its powers of supervision [2] over the Exchange's commission rate system to require immunity. *Thill Securities Corp. v. N.Y.S.E.*, 1969 Trade Cases (CCH) ¶ 72,911 at 87,490 (E.D. Wis.1969). On appeal, this court reversed and held that the factual record was insufficient to support summary judgment. 433

---

[*] Associate Judge Philip Nichols of the United States Court of Claims is sitting by designation.

[1.] The plaintiffs also challenged the Exchange's subsequent decision to provide non–member broker·dealers with economic access to the Exchange through a 40% reduction in commission rates. *See* discussion, *infra.* Because the anti·rebate rule as originally applied and as applied with the 40% discount are equally subject to the discussion in the text, we shall treat both challenges as resolved by that discussion.

[2.] Sections 19(b)(9) and (13) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78s(b)(9) and (13), prior to their amendment in 1975, provided:

> The Commission is ... authorized ... [to] order [an Exchange] to alter or supplement [its] rules (insofar as necessary or appropriate to effect such changes) in respect to such matters as ... (9) the fixing of reasonable rates of commission, interest, listing, and other charges ... and (13) similar matters.

F.2d 264 (7th Cir. 1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). This court found that further factual investigation was required to determine, among other things, the degree to which the SEC was in fact exercising its supervisory powers and whether the rule was necessary to "make the Securities and Exchange Act work."[3] *Id.* at 269–70. This court did not disagree, however, with the district court's finding that the rule was an integral part of the Exchange's fixing of reasonable rates of commission within the meaning of § 19(b)(9) of the 1934 Securities Exchange Act. *See* note 3, *supra.*

Following the remand, the district court granted petitions to intervene by the Securities Exchange Commission and the United States. The SEC argued that it was actively engaged in reviewing the anti–rebate rule as part of its review of the overall fixed commission rate system and that the court should therefore not engage in an antitrust analysis which might interfere with the Commission's review. The United States, on the other hand, contended that the court should review and enjoin the operation of the anti–rebate rule as violative of the antitrust laws.

After the trial was concluded and while the district court had the case under advisement, the Supreme Court rendered its decision in *Gordon v. The New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975). In *Gordon*, the Court found that the Exchange's system of fixed rates of commission was within the exclusive jurisdiction of the SEC under § 19(b)(9), and, therefore, was not subject to attack under the antitrust laws. In the light of *Gordon*, the Government's intervening complaint for injunctive relief in this case was dismissed without objection.

In August of 1979, after a significant delay, the district court found *Gordon* dispositive of the other issues in this case and dismissed Thill's complaint. 473 F.Supp. 1364 (E.D.Wis.1979). In its thorough and well–reasoned opinion, the court reaffirmed its earlier decision that the anti–rebate rule was an "integral part" of the fixed commission rate system which had been granted antitrust immunity in *Gordon*. Moreover, it held that, as in *Gordon*, the evidence established that the SEC did, in fact, adequately exercise its regulatory authority. The court then concluded that the anti–rebate rule was therefore immune from antitrust analysis. It is from this decision that Thill appeals.

A complete recitation of the factual background of this case is not necessary as a concise summary was given by this court in its prior opinion. It is sufficient to say that Thill contends that the members of the Exchange engaged in an unlawful and unreasonable combination and conspiracy in restraint of interstate trade and commerce, and unlawfully and unreasonably monopolized the securities market in the United States.[4] The Exchange members (herein-

---

**3.** This phrasing of the requirement of "necessity" of the rule was specifically rejected by the Supreme Court in *Gordon v. N.Y.S.E.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), when it stated:

> To the extent that the Court of Appeals in *Thill* viewed the question of implied repeal as a question of fact, concerning whether the particular rule itself is necessary to make the Act work, we decline to follow that lead. *Id.* at 687, 95 S.Ct. at 2613-2614.
>
> ... On one hand, there is the factual question of whether fixed commission rates are actually necessary to the operation of the exchanges as contemplated under the Securities Exchange Act. On the other hand, there is the legal question as to whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme which

specifically authorized the SEC to oversee the fixing of commission rates. The factual question is not before us in this case. Rather, we are concerned with whether antitrust immunity, as a matter of law, must be implied in order to permit the Exchange Act to function as envisioned by the Congress. The issue of the wisdom of fixed rates becomes relevant only when it is determined that there is no antitrust immunity.

*Id.* at 688, 95 S.Ct. at 2614.

**4.** Thill also complained that the members of the Exchange engaged in pirating non–members' customers and unfair advertising practices which have exacerbated the effects of the anti–rebate rule. In light of our decision regarding the rule itself, we, as did the district court, decline to investigate these appendant practices.

after referred to collectively as the Exchange) allegedly accomplished this result by enforcing the rule which prohibits any member from sharing with, or rebating to, a non–member any of the commissions earned on a securities transaction occurring on the floor of the Exchange, even though that non–member might be a broker–dealer who furnished the order or provided other valuable services or assistance in the execution of the order. In essence, Thill challenges the fact that the anti–rebate rule did not incorporate an exception for non–member broker–dealers. Thill's argument assumes without justification that the purpose of the fixed rate system was to fix only the rates charged to the non–broker–dealer public and concludes, relying upon the language in *Gordon*, that the rule which fixes the rate charged to broker–dealers was not "necessary" to achieve this end. Thill also bases its challenge on a "premise" it gleans from *Silver v. N.Y.S.E.*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), that "when a private group exercises joint control over access to an organized market crucial to doing business, access to that market must be made available to all in the trade."

The problem with Thill's position is that it misinterprets the requirement of "necessity" posited in *Gordon, see* note 3, *supra,* and overlooks the central issue in this case. The substantive question of whether or not the rule as written would have been violative of the antitrust laws is not properly before this court if, as was twice held by the district court, the SEC explicitly or implicitly approved the rule pursuant to its statutory authority granted in the 1934 Act. As the Supreme Court stated in *Gordon*, "[t]he wisdom of the [rule] becomes relevant only when it is determined that there is no antitrust immunity." 422 U.S. at 688, 95 S.Ct. at 2614. It is to the immunity question, therefore, that we now turn.

The general principles applicable to issues of antitrust immunity have been well–established by the Supreme Court. In *Silver, supra,* for example, the Court addressed itself to a decision by the Exchange, reached without the benefit of a public hearing or notice to the affected parties, which disallowed direct wire connections between its members on the floor and non–member brokers. The Exchange claimed immunity from antitrust analysis, contending that its decision was protected under provisions of the 1934 Exchange Act which granted it the power to regulate, in various ways, the relationships between members and non–members, and granted the SEC the power to review all Exchange rules governing these relationships. The Supreme Court discussed the development of the preference expressed in the 1934 Act for Exchange self–regulation, but noted that although the SEC had the power to review certain Exchange rules, thus granting antitrust immunity, the Commission did not have the power to review and approve specific applications by the Exchange of these general rules. The Court held that because the Exchange's no–wire directive properly belonged in this latter class, the SEC did not have exclusive jurisdiction under the Exchange Act. Given the "fundamentally unfair manner" in which the Exchange had applied its rules, the Court held that the order was subject to attack under the antitrust laws.

*Gordon, supra,* continued the resolution of the conflict between the antitrust goals and the Exchange Act's allowance of certain anti–competitive conduct, specifically with regard to the Exchange Act's countenance of fixed commission rates. It is interesting to note that the plaintiffs in that case also originally challenged the Exchange's rule under attack here which disallowed discounted commission rates to non–members utilizing the Exchange facilities. In its opinion, the Court noted that repeal of the antitrust laws is not favored nor casually allowed, and engaged in a detailed history of the growth of the fixed–rate system and of the SEC's exercise of its statutory power to review and supervise that system. The test to be applied, the Court held, was "whether implied repeal of the antitrust laws is necessary to make the Exchange Act provisions work," *id.* at 686, 95 S.Ct. at 2613. Relying upon § 19(b)(9), the Court

concluded that the case involved "explicit statutory authorization for SEC review of all exchange rules and practices dealing with rates of commission and resultant SEC continuing activity." 422 U.S. at 685, 95 S.Ct. at 2612–2613. Given the SEC's explicit and implicit approval of the fixed rate structure pursuant to explicit statutory authority and the obvious interference an antitrust action would have had upon the Exchange Act's regulatory scheme, immunity from the antitrust action was held to be implied in the Exchange Act.

A recent case utilizing this analysis is *Abbott Securities Corp. v. N.Y.S.E.*, 384 F.Supp. 668 (D.D.C.1974), where the court found antitrust immunity for the Exchange's 1968 prohibition of customer directed "give–ups."[5] The plaintiffs there challenged, *inter alia*,[6] the Exchange's ban on non–member economic access which occurred between the time the give–ups were outlawed by the Exchange on December 5, 1969, and the time the 40% reduction in commissions charged to non–member broker–dealers was adopted in 1972. After discussing the holding in *Silver, supra,* the court stated:

> Since it is a fact that the issue of economic access to non–member broker–dealers is inextricably intertwined with the practice of fixing commission rates ... and further that the SEC had review jurisdiction of this conduct pursuant to § 19(b) of the 1934 Securities Exchange Act, we

find as a matter of law that the defendant is immune from the operation of the antitrust laws for the alleged conduct....

384 F.Supp. at 670.

The district court in the instant action employed a similar analysis to find immunity. Relying upon a factual finding that the anti–rebate rule was an integral part of the fixed commission rate system and accepting the history of the SEC's review of the system set forth in *Gordon,* the court found *Gordon* dispositive and immunity required.[7]

■ We fully subscribe to the district court's analysis and conclusions in the present case. Whether viewed as a factual finding calling for the application of the clearly erroneous standard or otherwise, it is clear that the anti–rebate rule was an integral part of the entire fixed–commission rate system. The rule in fact is simply descriptive clauses in the very Exchange rule providing for the fixed rates. Not only was the anti–rebate rule, therefore, implicitly subject to SEC review and approval each time the Commission reviewed the Exchange's proposed rate increases between 1934 and 1968, but it was also specifically discussed by the SEC in its "Report of Special Study of Securities Markets," H.R. Doc. No. 95, 88th Cong., 1st Sess. (1963), issued prior to the initiation of this lawsuit, where the Commission stated:

5. "Give -ups" involved the payment by an executing broker to another broker–dealer, who may have had nothing whatsoever to do with the transaction, of a part of the commission charged to the customer for executing the order. They were directed by customers and used primarily by managers of mutual funds to reward broker-dealers, including non–members, for their sales efforts in selling mutual fund shares. Because the Commission believed that the practice produced a conflict between the interest of mutual fund shareholders in lower commission charges and the interest of mutual fund advisors and underwriters in stimulating the sales of additional shares in order to obtain the give–ups, the Exchange discontinued the practice on December 5, 1969.

6. The court at first granted a trial on the claim that the Exchange enforced the anti–rebate rule with predatory intent, but later reversed itself

in light of the later–decided *Gordon,* holding that the Exchange enjoyed total immunity from the operation of the antitrust laws irrespective of the Exchange's intent. *Abbott Securities Corp. v. N.Y.S.E.,* 1976–2 Trade Cases (CCH) ' 61,017 (D.D.C.1976), *aff'd,* 569 F.2d 159 (D.C. Cir.1977).

7. Given the SEC's adoption of Rule 19b–3, 17 C.F.R. § 240.196.3, which required the elimination of all fixed–rate commissions as of May 1, 1975, the district court dismissed plaintiff's complaint for injunctive relief as moot. Though this conclusion would seem warranted, *see Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972), we need not decide this question in light of our decision on the merits of the damage counts, which is equally applicable to the request for an injunction.

Under the public commission schedule of the NYSE, a non–member broker must pay a member the same commission that his customer must pay if he were to place the order directly with a member. The Study identified a number of ways non–members had secured indirect access to the Exchange, including give–ups and other reciprocal business practices,[8] and concluded that the issue of non–member access was "far too complex in its own right and too involved with other complex questions to be the subject of specific recommendations of the study." The Study recommended that the issue "should be the subject of joint Commission–Exchange study, particularly with reference to problems of competition, depths of markets, and reciprocity."

The resulting joint investigations, recommendations and negotiations continued through the subsequent years, partially consisting of the Exchange's submission of proposals for limited non–member access in 1964, 1965, and 1968. All of these proposals were rejected by the Commission with specific recommendations or counter–proposals. In its replies, the Commission expressed its belief that non–member broker–dealers who caused their customer's orders to be brought on the floor through a member were entitled to compensation for their services, but also noted its concern that "[i]f . . . arrangements are made for such sharing of commissions, they should be so confined that they cannot be used as a vehicle for perpetuating or extending improper give–up practices."

■ The record reveals that the anti–rebate rule was consistently treated by the SEC as a component of the fixed commission rate system. Combined with the detailed analysis in *Gordon*, it establishes that the SEC fully exercised its statutory jurisdiction to review the rule as an integral part of the rate structure, including the analysis of antitrust considerations. In such circumstances, there can be little question that immunity from the obvious interference separate private antitrust actions would cause was intended in the Exchange Act.

■ As stated above, it is clear that the Thill's true complaint goes to the substance of the rule. Its argument that fixing the commission rate to non–member broker–dealers was not "necessary" to maintain the statutorily–authorized fixed "public" rates is really a substantive attack on the rule's failure to except non–member broker–dealers from the anti–rebate provisions, couched in the language utilized in *Gordon*. However, this argument begs the question before the court because we must first ask whether the rule *as written* was reviewed by the SEC pursuant to statutory authority. Once *given* the rule's reviewed proviso that the proper distinction to be drawn between those who may and may not receive discounts is between members and non–members of the Exchange and not, as Thill would prefer, between broker–dealers and other members of the public, it is obvious that to allow any non–member rebates would have destroyed the established system of fixed rates. It therefore follows that the distinction *as set forth in the rule* was an integral and essential part of the entire fixed rate system for, as the district court held, without the anti–rebate provision, the fixed rates as established would not have been fixed. Thill's attack on the *wisdom* of the distinction drawn in the rule, therefore, which is in actuality an attack on the fixed rate system itself, must fail in light of the immunity provided in *Gordon*.[9] The district court, therefore, is

AFFIRMED.

---

8. A member desiring to reciprocate for commission business given to him by a non–member broker–dealer could do so by referring to the non-member the opportunity to earn a commission in a trade to be executed on a regional exchange to which the non–member belonged.

9. We find unpersuasive the appellant's argument that *Gordon* is distinguishable in light of that opinion's distinguishing of this court's prior opinion in *Thill (Thill I)*. *Gordon* was before the Supreme Court, as was *Thill I* before this court, on appeal from a grant of summary judgment to the Exchange. The Government in *Gordon*, relying upon *Thill I*, argued that the

CUDAHY, Circuit Judge, concurring:

As a matter of elementary economics it is difficult for me to see why a blanket anti–rebate rule was "necessary" or "integral" to a system of maintaining fixed commissions for *investors*. And we may assume, in this context at least, that the Securities and Exchange Act was enacted for *investor* benefit. An effect of the anti–rebate rule was to tie the public (ultimate consumers) and the non–member broker–dealers (middlemen) to the same rate structures, thus effectively squeezing or squeezing out these middlemen with no apparent benefit to the public. The rule as applied to non–member broker–dealers seemingly had no effect on the public except to limit the number of broker–dealers who could economically transact New York Stock Exchange business for investors. This limitation was presumably a detriment to the investing public.

But, despite these reservations, I accept Judge Pell's conclusions as dictated in part by the findings of the district court and, above all, by the pointed language of the Supreme Court in *Gordon v. New York Stock Exchange*:

"We do not believe it necessary, in the circumstances of this case, to take further evidence concerning the competitive effects of fixed rates, or the necessity of fixed rates as a keystone of the operation of exchanges under the Exchange Act. To the extent that the Court of Appeals in *Thill* viewed the question of implied repeal [of the antitrust laws] as a question of fact, concerning whether the particular rule itself is necessary to make the Act work, we decline to follow that lead.

. . . . .

The issue of the wisdom of fixed rates becomes relevant only when it is determined that there is no antitrust immunity."

422 U.S. 659 at 687, 688, 95 S.Ct. 2598, at 2613, 2614.

---

factual record was inadequate to support summary judgment and requested a remand. The Court disagreed, finding the record adequate, and distinguished *Thill I* on three grounds. First, the Court found that there was no evidence in *Thill I* regarding the extent of the SEC actual review of the anti–rebate rule. Second, the Court noted that the anti–rebate practice, unlike the fixed rate system itself, was not specifically mentioned in the Exchange Act although, as the Court stated, "the practice might reasonably be thought to be related to the fixing of commission rates." Last, the Court mentioned that the anti–rebate practice "does not necessarily apply uniformly and may be applied in a discriminatory manner."

We believe the record after trial in this case now supports the Exchange's position. As noted above, there is substantial and sufficient evidence establishing the adequacy of the SEC's review of the anti–rebate practice and the rule was well established to be an integral part of the rate structure. Furthermore, the appellant presented inadequate evidence that the rule was ever applied in a discriminatory manner. Thill's attempt to establish discrimination by pointing out that the rule applied only to non–members clearly is inapposite in light of the immunity this substantive portion of the rule enjoys, and its argument that discrimination existed due to the discretionary manner the reciprocal and give–up practices were administered is similarly irrelevant as those practices were themselves the subject of SEC review, *see Abbott, supra*, were outlawed by the Exchange, and are simply unconnected to the anti–rebate rule challenged here.