(Slip Opinion)          OCTOBER TERM, 2006          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CREDIT SUISSE SECURITIES (USA) LLC, FKA CREDIT SUISSE FIRST BOSTON LLC, ET AL. *v.* BILLING ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 05–1157.   Argued March 27, 2007—Decided June 18, 2007

Respondent investors filed suit, alleging that petitioner investment banks, acting as underwriters, violated antitrust laws when they formed syndicates to help execute initial public offerings (IPOs) for several hundred technology-related companies.  Respondents claim that the underwriters unlawfully agreed that they would not sell newly issued securities to a buyer unless the buyer committed (1) to buy additional shares of that security later at escalating prices (known as "laddering"), (2) to pay unusually high commissions on subsequent security purchases from the underwriters, or (3) to purchase from the underwriters other less desirable securities (known as "tying").  The underwriters moved to dismiss, claiming that federal securities law impliedly precludes application of antitrust laws to the conduct in question.  The District Court dismissed the complaints, but the Second Circuit reversed.

*Held:* The securities law implicitly precludes the application of the antitrust laws to the conduct alleged in this case.  Pp. 4–20.

   (a) Where regulatory statutes are silent in respect to antitrust, courts must determine whether, and in what respects, they implicitly preclude the antitrust laws' application.  Taken together, *Silver* v. *New York Stock Exchange*, 373 U. S. 341; *Gordon* v. *New York Stock Exchange, Inc.*, 422 U. S. 659; and *United States* v. *National Assn. of Securities Dealers, Inc.*, 422 U. S. 694 *(NASD)* make clear that a court deciding this preclusion issue is deciding whether, given context and likely consequences, there is a "clear repugnancy" between the securities law and the antitrust complaint, *i.e.,* whether the two are "clearly incompatible."  Moreover, *Gordon* and *NASD*, in finding sufficient incompatibility to warrant an implication of preclusion,

treated as critical: (1) the existence of regulatory authority under the securities law to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority; and (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct.  In addition, (4) in *Gordon* and *NASD* the possible conflict affected practices that lie squarely within an area of financial market activity that securities law seeks to regulate. Pp. 4–10.

(b) Several considerations—the underwriters' efforts jointly to promote and sell newly issued securities is central to the proper functioning of well-regulated capital markets; the law grants the SEC authority to supervise such activities; and the SEC has continuously exercised its legal authority to regulate this type of conduct—show that the first, second, and fourth conditions are satisfied in this case.  This leaves the third condition: whether there is a conflict rising to the level of incompatibility.  Pp. 10–12.

(c) The complaints here can be read as attacking the *manner* in which the underwriters jointly seek to collect "excessive" commissions through the practices of laddering, tying, and collecting excessive commissions, which according to respondents the SEC itself has already disapproved and, in all likelihood, will not approve in the foreseeable future.  Nonetheless, certain considerations, taken together, lead to the conclusion that securities law and antitrust law are clearly incompatible in this context.  Pp. 12–19.

(1) First, to permit antitrust actions such as this threatens serious securities-related harm.  For one thing, a fine, complex, detailed line separates activity that the SEC permits or encourages from activity that it forbids.  And the SEC has the expertise to distinguish what is forbidden from what is allowed.  For another thing, reasonable but contradictory inferences may be drawn from overlapping evidence that shows both unlawful antitrust activity and lawful securities marketing activity.  Further, there is a serious risk that antitrust courts, with different nonexpert judges and different nonexpert juries, will produce inconsistent results.  Together these factors mean there is no practical way to confine antitrust suits so that they challenge only the kind of activity the investors seek to target, which is presently unlawful and will likely remain unlawful under the securities law.  Rather, these considerations suggest that antitrust courts are likely to make unusually serious mistakes in this respect.  And that threat means that underwriters must act to avoid not simply conduct that the securities law forbids, but also joint conduct that the securities law permits or encourages.  Thus, allowing an antitrust lawsuit would threaten serious harm to the efficient functioning of

Syllabus

the securities market. Pp. 14–17.

(2) Second, any enforcement-related need for an antitrust lawsuit is unusually small. For one thing, the SEC actively enforces the rules and regulations that forbid the conduct in question. For another, investors harmed by underwriters' unlawful practices may sue and obtain damages under the securities law. Finally, the fact that the SEC is itself required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations makes it somewhat less necessary to rely on antitrust actions to address anticompetitive behavior. Pp. 17–18.

(3) In sum, an antitrust action in this context is accompanied by a substantial risk of injury to the securities markets and by a diminished need for antitrust enforcement to address anticompetitive conduct. Together these considerations indicate a serious conflict between application of the antitrust laws and proper enforcement of the securities law. The Solicitor General's proposal to avoid this conflict does not convincingly address these concerns. Pp. 18–19.

426 F. 3d 130, reversed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, SOUTER, GINSBURG, and ALITO, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment. THOMAS, J., filed a dissenting opinion. KENNEDY, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1157

CREDIT SUISSE SECURITIES (USA) LLC, FKA CREDIT
SUISSE FIRST BOSTON LLC, ET AL., PETITIONERS *v.*
GLEN BILLING ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 18, 2007]

JUSTICE BREYER delivered the opinion of the Court.

A group of buyers of newly issued securities have filed
an antitrust lawsuit against underwriting firms that
market and distribute those issues. The buyers claim that
the underwriters unlawfully agreed with one another that
they would not sell shares of a popular new issue to a
buyer unless that buyer committed (1) to buy additional
shares of that security later at escalating prices (a practice
called "laddering"), (2) to pay unusually high commissions
on subsequent security purchases from the underwriters,
or (3) to purchase from the underwriters other less desir-
able securities (a practice called "tying"). The question
before us is whether there is a "'plain repugnancy'" be-
tween these antitrust claims and the federal securities
law. See *Gordon* v. *New York Stock Exchange, Inc.,* 422.
U. S. 659, 682 (1975) (quoting *United States* v. *Philadel-
phia Nat. Bank*, 374 U. S. 321, 350–351 (1963)). We con-
clude that there is. Consequently we must interpret the
securities laws as implicitly precluding the application of
the antitrust laws to the conduct alleged in this case. See

422 U. S., at 682, 689, 691; see also *United States* v. *National Assn. of Securities Dealers, Inc.*, 422 U. S. 694 (1975) *(NASD); Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963).

I

A

The underwriting practices at issue take place during the course of an initial public offering (IPO) of shares in a company.  An IPO presents an opportunity to raise capital for a new enterprise by selling shares to the investing public.  A group of underwriters will typically form a syndicate to help market the shares.  The syndicate will investigate and estimate likely market demand for the shares at various prices.  It will then recommend to the firm a price and the number of shares it believes the firm should offer.  Ultimately, the syndicate will promise to buy from the firm all the newly issued shares on a specified date at a fixed, agreed-upon price, which price the syndicate will then charge investors when it resells the shares.  When the syndicate buys the shares from the issuing firm, however, the firm gives the syndicate a price discount, which amounts to the syndicate's commission.  See generally L. Loss & J. Seligman, Fundamentals of Securities Regulation 66–72 (4th ed. 2001).

At the heart of the syndicate's IPO marketing activity lie its efforts to determine suitable initial share prices and quantities.  At first, the syndicate makes a preliminary estimate that it submits in a registration statement to the Securities and Exchange Commission (SEC).  It then conducts a "road show" during which syndicate underwriters and representatives of the offering firm meet potential investors and engage in a process that the industry calls "book building."  During this time, the underwriters and firm representatives present information to investors about the company and the stock.  And they attempt to

gauge the strength of the investors' interest in purchasing the stock. For this purpose, underwriters might well ask the investors how their interest would vary depending upon price and the number of shares that are offered. They will learn, among other things, which investors might buy shares, in what quantities, at what prices, and for how long each is likely to hold purchased shares before selling them to others.

On the basis of this kind of information, the members of the underwriting syndicate work out final arrangements with the issuing firm, fixing the price per share and specifying the number of shares for which the underwriters will be jointly responsible. As we have said, after buying the shares at a discounted price, the syndicate resells the shares to investors at the fixed price, in effect earning its commission in the process.

## B

In January 2002, respondents, a group of 60 investors, filed two antitrust class-action lawsuits against the petitioners, 10 leading investment banks. They sought relief under §1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. §1; §2(c) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1527, 15 U. S. C. §13(c); and state antitrust laws. App. 1, 14. The investors stated that between March 1997 and December 2000 the banks had acted as underwriters, forming syndicates that helped execute the IPOs of several hundred technology-related companies. *Id.,* at 22. Respondents' antitrust complaints allege that the underwriters "abused the . . . practice of combining into underwriting syndicates" by agreeing among themselves to impose harmful conditions upon potential investors—conditions that the investors apparently were willing to accept in order to obtain an allocation of new shares that were in high demand. *Id.,* at 12.

These conditions, according to respondents, consist of a requirement that the investors pay "additional anticompetitive charges" over and above the agreed-upon IPO share price plus underwriting commission. In particular, these additional charges took the form of (1) investor promises "to place bids . . . in the aftermarket at prices above the IPO price" (*i.e.*, "laddering" agreements); (2) investor "commitments to purchase other, less attractive securities" (*i.e.*, "tying" arrangements); and (3) investor payment of "non-competitively determined" (*i.e.*, excessive) "commissions," including the "purchas[e] of an issuer's shares in follow-up or 'secondary' public offerings (for which the underwriters would earn underwriting discounts)." *Id.,* at 12–13. The complaint added that the underwriters' agreement to engage in some or all of these practices artificially inflated the share prices of the securities in question. *Id.,* at 32.

The underwriters moved to dismiss the investors' complaints on the ground that federal securities law impliedly precludes application of antitrust laws to the conduct in question. (The antitrust laws at issue include the commercial bribery provisions of the Robinson-Patman Act.) The District Court agreed with petitioners and dismissed the complaints against them. See *In re Initial Public Offering Antitrust Litigation*, 287 F. Supp. 2d 497, 524–525 (SDNY 2003) *(IPO Antitrust).* The Court of Appeals for the Second Circuit reversed, however, and reinstated the complaints. 426 F. 3d 130, 170, 172 (2005). We granted the underwriters' petition for certiorari. And we now reverse the Court of Appeals.

II

A

Sometimes regulatory statutes explicitly state whether they preclude application of the antitrust laws. Compare, *e.g.*, Webb-Pomerene Act, 15 U. S. C. §62 (expressly pro-

viding antitrust immunity) with §601(b)(1) of the Tele-communications Act of 1996, 47 U. S. C. §152 (stating that antitrust laws remain applicable). See also *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398, 406–407 (2004) (analyzing the antitrust saving clause of the Telecommunications Act). Where regulatory statutes are silent in respect to antitrust, however, courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws. Those determinations may vary from statute to statute, depending upon the relation between the antitrust laws and the regulatory program set forth in the particular statute, and the relation of the specific conduct at issue to both sets of laws. Compare *Gordon*, 422 U. S., at 689 (finding implied preclusion of antitrust laws); and *NASD*, 422 U. S., at 729–730 (same), with *Otter Tail Power Co.* v. *United States*, 410 U. S. 366, 374–375 (1973) (finding no implied immunity); *Philadelphia Nat. Bank*, 374 U. S., at 352 (same); and *Silver*, 373 U. S., at 360 (same). See also *Phonotele, Inc.* v. *American Tel. & Tel. Co.*, 664 F. 2d 716, 727 (CA9 1981).

Three decisions from this Court specifically address the relation of securities law to antitrust law. In *Silver* the Court considered a dealer's claim that, by expelling him from the New York Stock Exchange, the Exchange had violated the antitrust prohibition against group "boy-cott[s]." 373 U. S., at 347. The Court wrote that, where possible, courts should "reconcil[e] the operation of both [*i.e.*, antitrust and securities] statutory schemes . . . rather than holding one completely ousted." *Id.,* at 357. It also set forth a standard, namely that "[r]epeal of the antitrust laws is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." *Ibid.* And it held that the securities law did *not* preclude application of the anti-trust laws to the claimed boycott *insofar as the Exchange*

*denied the expelled dealer a right to fair procedures. Id.,* at 359–360.

In reaching this conclusion, the Court noted that the SEC lacked jurisdiction under the securities law "to review particular instances of enforcement of exchange rules"; that "nothing [was] built into the regulatory scheme which performs the antitrust function of insuring" that rules that injure competition are nonetheless "justified as furthering" legitimate regulatory "ends"; that the expulsion "would clearly" violate "the Sherman Act unless justified by reference to the purposes of the Securities Exchange Act"; and that it could find *no such justifying purpose* where the Exchange took "anticompetitive collective action . . . *without according fair procedures.*" *Id.*, at 357–358, 364 (emphasis added).

In *Gordon* the Court considered an antitrust complaint that essentially alleged "price fixing" among stockbrokers. It charged that members of the New York Stock Exchange had agreed to fix their commissions on sales under $500,000. And it sought damages and an injunction forbidding future agreements. 422 U. S., at 661, and n. 3. The lawsuit was filed at a time when regulatory attitudes toward fixed stockbroker commissions were changing. The fixed commissions challenged in the complaint were applied during a period when the SEC approved of the practice of fixing broker-commission rates. But Congress and the SEC had both subsequently disapproved for the future the fixing of some of those rates. See *id.*, at 690–691.

In deciding whether antitrust liability could lie, the Court repeated *Silver*'s general standard in somewhat different terms: It said that an "implied repeal" of the antitrust laws would be found only "where there is a 'plain repugnancy between the antitrust and regulatory provisions.'" 422 U. S., at 682 (quoting *Philadelphia Nat. Bank, supra*, at 350–351). It then held that the securities laws impliedly precluded application of the antitrust laws

in the case at hand. The Court rested this conclusion on three sets of considerations. For one thing, the securities law "gave the SEC direct regulatory power over exchange rules and practices with respect to the fixing of reasonable rates of commission." 422 U. S., at 685 (internal quotation marks omitted). For another, the SEC had "taken an active role in review of proposed rate changes during the last 15 years," and had engaged in "continuing activity" in respect to the regulation of commission rates. *Ibid.* Finally, without antitrust immunity, "the exchanges and their members" would be subject to "conflicting standards." *Id.,* at 689.

This last consideration—the conflict—was complicated due to Congress', and the agency's, changing views about the validity of fixed commissions. As far as the *past* fixing of rates was concerned, the conflict was clear: The antitrust law had forbidden the very thing that the securities law had then permitted, namely an anticompetitive rate setting process. In respect to the future, however, the conflict was less apparent. That was because the SEC's new (congressionally authorized) prohibition of (certain) fixed rates would take effect in the near-term future. And after that time the SEC and the antitrust law would *both* likely prohibit some of the ratefixing to which the plaintiff's injunction would likely apply. See *id.*, at 690–691.

Despite the likely compatibility of the laws in the future, the Court nonetheless expressly found *conflict*. The conflict arose from the fact that the law permitted the SEC to supervise the competitive setting of rates and to "*reintroduc[e] . . . fixed rates,*" *id.,* at 691 (emphasis added), under certain conditions. The Court consequently wrote that "failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates." *Ibid.* The upshot is that, in light of potential future conflict, the Court found that the securities law precluded antitrust liability even in respect

to a practice that both antitrust law and securities law might forbid.

In *NASD* the Court considered a Department of Justice antitrust complaint claiming that mutual fund companies had agreed with securities broker-dealers (1) to fix "resale" prices, *i.e.*, the prices at which a broker-dealer would sell a mutual fund's shares to an investor or buy mutual fund shares from a fund investor (who wished to redeem the shares); (2) to fix other terms of sale including those related to when, how, to whom, and from whom the broker-dealers might sell and buy mutual fund shares; and (3) to forbid broker-dealers from freely selling to, and buying shares from, one another. See 422 U. S., at 700–703.

The Court again found "clear repugnancy," and it held that the securities law, by implication, precluded all parts of the antitrust claim. *Id.,* at 719. In reaching this conclusion, the Court found that antitrust law (*e.g.*, forbidding resale price maintenance) and securities law (*e.g.*, permitting resale price maintenance) were in conflict. In deciding that the latter trumped the former, the Court relied upon the same kinds of considerations it found determinative in *Gordon*. In respect to the last set of allegations (restricting a free market in mutual fund shares among brokers), the Court said that (1) the relevant securities law "enables [the SEC] to monitor the activities questioned"; (2) "the history of Commission regulations suggests no laxity in the exercise of this authority"; and hence (3) allowing an antitrust suit to proceed that is "so directly related to the SEC's responsibilities" would present "a substantial danger that [broker-dealers and other defendants] would be subjected to duplicative and inconsistent standards." See *NASD,* 422 U. S., at 734–735.

As to the other practices alleged in the complaint (concerning, *e.g.*, resale price maintenance), the Court emphasized that (1) the securities law "vested in the SEC final authority to determine whether and to what extent" the

relevant practices "should be tolerated," *id.,* at 729; (2) although the SEC has not actively supervised the relevant practices, that is only because the statute "reflects a clear congressional determination that, subject to Commission oversight, mutual funds should be allowed to retain the initiative in dealing with the potentially adverse effects of disruptive trading practices," *id.,* at 727; and (3) the SEC has supervised the funds insofar as its "acceptance of fund-initiated restrictions for more than three decades . . . manifests an informed administrative judgment that the contractual restrictions . . . were appropriate means for combating the problems of the industry," *id*., at 728. The Court added that, in these respects, the SEC had engaged in "precisely the kind of administrative oversight of private practices that Congress contemplated." *Ibid.*

As an initial matter these cases make clear that JUSTICE THOMAS is wrong to regard §§77p(a) and 78bb(a) as saving clauses so broad as to preserve all antitrust actions. See *post*, p. \_\_\_ (dissenting opinion). The United States advanced the same argument in *Gordon*. See Brief for United States as *Amicus Curiae* in *Gordon* v. *New York Stock Exchange, Inc.*, O. T. 1974, No. 74–304, pp. 8, 42. And the Court, in finding immunity, necessarily rejected it. See also *NASD, supra,* at 694 (same holding); *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 383 (1983) (finding saving clause applicable to overlap between *securities* laws where that "overlap [was] neither unusual nor unfortunate" (internal quotation marks omitted)). Although one party has made the argument in this Court, it was not presented in the courts below. And we shall not reexamine it.

This Court's prior decisions also make clear that, when a court decides whether securities law precludes antitrust law, it is deciding whether, given context and likely consequences, there is a "clear repugnancy" between the securities law and the antitrust complaint—or as we shall sub-

sequently describe the matter, whether the two are "clearly incompatible." Moreover, *Gordon* and *NASD*, in finding sufficient incompatibility to warrant an implication of preclusion, have treated the following factors as critical: (1) the existence of regulatory authority under the securities law to supervise the activities in question; (2) evidence that the responsible regulatory entities exercise that authority; and (3) a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct. We also note (4) that in *Gordon* and *NASD* the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law seeks to regulate.

B

These principles, applied to the complaints before us, considerably narrow our legal task. For the parties cannot reasonably dispute the existence here of several of the conditions that this Court previously regarded as crucial to finding that the securities law impliedly precludes the application of the antitrust laws.

First, the activities in question here—the underwriters' efforts jointly to promote and to sell newly issued securities—is central to the proper functioning of well-regulated capital markets. The IPO process supports new firms that seek to raise capital; it helps to spread ownership of those firms broadly among investors; it directs capital flows in ways that better correspond to the public's demand for goods and services. Moreover, financial experts, including the securities regulators, consider the general kind of joint underwriting activity at issue in this case, including road shows and book-building efforts essential to the successful marketing of an IPO. See Memorandum *Amicus Curiae* of SEC in *IPO Antitrust,* Case No. 01 CIV 2014 (WHP) (SDNY), pp. 15, 39–40, App. D to Pet. for Cert. 124a, 138a,

155a–157a (hereinafter Brief for SEC). Thus, the antitrust complaints before us concern practices that lie at the very heart of the securities marketing enterprise.

Second, the law grants the SEC authority to supervise all of the activities here in question. Indeed, the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit, and otherwise regulate virtually every aspect of the practices in which underwriters engage. See, *e.g.*, 15 U. S. C. §§77b(a)(3), 77j, 77z–2 (granting SEC power to regulate the process of book-building, solicitations of "indications of interest," and communications between underwriting participants and their customers, including those that occur during road shows); §78o(c)(2)(D) (granting SEC power to define and prevent through rules and regulations acts and practices that are fraudulent, deceptive, or manipulative); §78i(a)(6) (similar); §78j(b) (similar). Private individuals who suffer harm as a result of a violation of pertinent statutes and regulations may also recover damages. See §§78bb, 78u–4, 77k.

Third, the SEC has continuously exercised its legal authority to regulate conduct of the general kind now at issue. It has defined in detail, for example, what underwriters may and may not do and say during their road shows. Compare, *e.g.*, Guidance Regarding Prohibited Conduct In Connection with IPO Allocations, 70 Fed. Reg. 19672 (2005), with Regulation M, 17 CFR §§242.100–242.105 (2006). It has brought actions against underwriters who have violated these SEC regulations. See Brief for SEC 13–14, App. D to Pet. for Cert. 136a–138a. And private litigants, too, have brought securities actions complaining of conduct virtually identical to the conduct at issue here; and they have obtained damages. See, *e.g.*, *In re Initial Pub. Offering Securities Litigation,* 241 F. Supp. 2d 281 (SDNY 2003).

The preceding considerations show that the first condi-

tion (legal regulatory authority), the second condition (exercise of that authority), and the fourth condition (heartland securities activity) that were present in *Gordon* and *NASD* are satisfied in this case as well. Unlike *Silver,* there is here no question of the existence of appropriate regulatory authority, nor is there doubt as to whether the regulators have exercised that authority. Rather, the question before us concerns the third condition: Is there a conflict that rises to the level of incompatibility? Is an antitrust suit such as this likely to prove practically incompatible with the SEC's administration of the Nation's securities laws?

### III

### A

Given the SEC's comprehensive authority to regulate IPO underwriting syndicates, its active and ongoing exercise of that authority, and the undisputed need for joint IPO underwriter activity, we do not read the complaints as attacking the bare existence of IPO underwriting syndicates or any of the joint activity that the SEC considers a necessary component of IPO-related syndicate activity. See Brief for SEC 15, 39–40, App. D to Pet. for Cert. 138a, 155a–157a. See also *IPO Antitrust*, 287 F. Supp. 2d, at 507 (discussing the history of syndicate marketing of IPOs); App. 12 (complaint attacks underwriters "*abuse*" of "the preexisting practice of combining into underwriting syndicates" (emphasis added)); H. R. Rep. No. 1383, 73d Cong., 2d Sess., 6–7 (1934); S. Rep. No. 792, 73d Cong., 2d Sess., 5 (1934) (law must give to securities agencies freedom to regulate agreements among syndicate members). Nor do we understand the complaints as questioning underwriter agreements to fix the levels of their commissions, whether or not the resulting price is "excessive." See *Gordon*, 422 U. S., at 688–689 (securities law conflicts with, and therefore precludes, antitrust attack on the

fixing of commissions where SEC has not approved, but later *might* approve, the practice).

We nonetheless can read the complaints as attacking the *manner* in which the underwriters jointly seek to collect "excessive" commissions. The complaints attack underwriter efforts to collect commissions through certain practices (*i.e.*, laddering, tying, collecting excessive commissions in the form of later sales of the issued shares), which according to respondents the SEC itself has already disapproved and, in all likelihood, will not approve in the foreseeable future. In respect to this set of claims, they contend that there is no possible "conflict" since both securities law and antitrust law aim to prohibit the same undesirable activity. Without a conflict, they add, there is no "repugnance" or "incompatibility," and this Court may not imply that securities law precludes an antitrust suit.

### B

We accept the premises of respondents' argument—that the SEC has full regulatory authority over these practices, that it has actively exercised that authority, but that the SEC has *disapproved* (and, for argument's sake, we assume that it will continue to disapprove) the conduct that the antitrust complaints attack. Nonetheless, we cannot accept respondents' conclusion. Rather, several considerations taken together lead us to find that, even on these prorespondent assumptions, securities law and antitrust law are clearly incompatible.

First, to permit antitrust actions such as the present one *still* threatens serious securities-related harm. For one thing, an unusually serious legal line-drawing problem remains unabated. In the present context only a fine, complex, detailed line separates activity that the SEC permits or encourages (for which respondents must concede antitrust immunity) from activity that the SEC must (and inevitably will) forbid (and which, on respondents'

theory, should be open to antitrust attack).

For example, in respect to "laddering" the SEC forbids an underwriter to "solicit customers prior to the completion of the distribution regarding whether and at what price and in what quantity they intend to place immediate aftermarket orders for IPO stock," 70 Fed. Reg. 19675–19676 (emphasis deleted); 17 CFR §§242.100–242.105. But at the same time the SEC permits, indeed encourages, underwriters (as part of the "book building" process) to "inquir[e] as to a customer's desired future position in the longer term (for example, three to six months), and the price or prices at which the customer might accumulate that position without reference to immediate aftermarket activity." 70 Fed. Reg. 19676.

It will often be difficult for someone who is not familiar with accepted syndicate practices to determine with confidence whether an underwriter has insisted that an investor buy more shares in the immediate aftermarket (forbidden), or has simply allocated more shares to an investor willing to purchase additional shares of that issue in the long run (permitted). And who but a securities expert could say whether the present SEC rules set forth a virtually permanent line, unlikely to change in ways that would permit the sorts of "laddering-like" conduct that it now seems to forbid? Cf. *Gordon, supra,* at 690–691.

Similarly, in respect to "tying" and other efforts to obtain an increased commission from future sales, the SEC has sought to prohibit an underwriter "from demanding . . . an offer from their customers of any payment or other consideration [such as the purchase of a different security] in addition to the security's stated consideration." 69 Fed. Reg. 75785 (2004). But the SEC would permit a firm to "allocat[e] IPO shares to a customer because the customer has separately retained the firm for other services, when the customer has not paid excessive compensation in relation to those services." *Ibid.,* n. 108. The National

Association of Securities Dealers (NASD), over which the SEC exercises supervisory authority, has also proposed a rule that would prohibit a member underwriter from "offering or threatening to withhold" IPO shares "as consideration or inducement for the receipt of compensation that is excessive in relation to the services provided." *Id.,* at 77810. The NASD would allow, however, a customer legitimately to compete for IPO shares by increasing the level and quantity of compensation it pays to the underwriter. See *Ibid.* (describing NASD Proposed Rule 2712(a)).

Under these standards, to distinguish what is forbidden from what is allowed requires an understanding of just when, in relation to services provided, a commission is "excessive," indeed, so "excessive" that it will remain *permanently* forbidden, see *Gordon,* 422 U. S., at 690–691. And who but the SEC itself could do so with confidence?

For another thing, evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical. Consider, for instance, a conversation between an underwriter and an investor about how long an investor intends to hold the new shares (and at what price), say a conversation that elicits comments concerning both the investor's short and longer term plans. That exchange might, as a plaintiff sees it, provide evidence of an underwriter's insistence upon "laddering" or, as a defendant sees it, provide evidence of a lawful effort to allocate shares to those who will hold them for a longer time. See Brief for United States as *Amicus Curiae* 27.

Similarly, the same somewhat ambiguous conversation might help to establish an effort to collect an unlawfully high commission through atypically high commissions on later sales or through the sales of less popular stocks. Or it might prove only that the underwriter allocates more popular shares to investors who will help stabilize the

aftermarket share price. See, *e.g., Department of Enforcement,* Disciplinary Proceeding No. CAF030014, pp. 12–13 (NASD Office of Hearing Officers, Mar. 3, 2006).

Further, antitrust plaintiffs may bring lawsuits throughout the Nation in dozens of different courts with different nonexpert judges and different nonexpert juries. In light of the nuanced nature of the evidentiary evaluations necessary to separate the permissible from the impermissible, it will prove difficult for those many different courts to reach consistent results. And, given the fact-related nature of many such evaluations, it will also prove difficult to assure that the different courts evaluate similar fact patterns consistently. The result is an unusually high risk that different courts will evaluate similar factual circumstances differently. See Hovenkamp, Antitrust Violations in Securities Markets, 28 J. Corp. L. 607, 629 (2003) ("Once regulation of an industry is entrusted to jury trials, the outcomes of antitrust proceedings will be inconsistent with one another . . . ").

Now consider these factors together—the fine securities-related lines separating the permissible from the impermissible; the need for securities-related expertise (particularly to determine whether an SEC rule is likely permanent); the overlapping evidence from which reasonable but contradictory inferences may be drawn; and the risk of inconsistent court results. Together these factors mean there is no practical way to confine antitrust suits so that they challenge only activity of the kind the investors seek to target, activity that is presently unlawful and will likely remain unlawful under the securities law. Rather, these factors suggest that antitrust courts are likely to make unusually serious mistakes in this respect. And the threat of antitrust mistakes, *i.e.,* results that stray outside the narrow bounds that plaintiffs seek to set, means that underwriters must act in ways that will avoid not simply

conduct that the securities law forbids (and will likely continue to forbid), but also a wide range of joint conduct that the securities law permits or encourages (but which they fear could lead to an antitrust lawsuit and the risk of treble damages). And therein lies the problem.

This kind of problem exists to some degree in respect to other antitrust lawsuits. But here the factors we have mentioned make mistakes unusually likely (a matter relevant to Congress' determination of which institution should regulate a particular set of market activities). And the role that joint conduct plays in respect to the marketing of IPOs, along with the important role IPOs themselves play in relation to the effective functioning of capital markets, means that the securities-related costs of mistakes is unusually high. It is no wonder, then, that the SEC told the District Court (consistent with what the Government tells us here) that a "failure to hold that the alleged conduct was immunized would threaten to disrupt the full range of the Commission's ability to exercise its regulatory authority," adding that it would have a "chilling effect" on "lawful joint activities . . . of tremendous importance to the economy of the country." Brief for SEC 40, App. D to Pet. for Cert. 157a.

We believe it fair to conclude that, where conduct at the core of the marketing of new securities is at issue; where securities regulators proceed with great care to distinguish the encouraged and permissible from the forbidden; where the threat of antitrust lawsuits, through error and disincentive, could seriously alter underwriter conduct in undesirable ways, to allow an antitrust lawsuit would threaten serious harm to the efficient functioning of the securities markets.

Second, any enforcement-related need for an antitrust lawsuit is unusually small. For one thing, the SEC actively enforces the rules and regulations that forbid the conduct in question. For another, as we have said, inves-

tors harmed by underwriters' unlawful practices may bring lawsuits and obtain damages under the securities law. See *supra*, at 10–11. Finally, the SEC is itself required to take account of competitive considerations when it creates securities-related policy and embodies it in rules and regulations. And that fact makes it somewhat less necessary to rely upon antitrust actions to address anticompetitive behavior. See 15 U. S. C. §77b(b) (instructing the SEC to consider, "in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation"); §78w(a)(2) (the SEC "shall consider among other matters the impact any such rule or regulation would have on competition"); *Trinko*, 540 U. S., at 412 ("[T]he additional benefit to competition provided by antitrust enforcement will tend to be small" where other laws and regulatory structures are "designed to deter and remedy anticompetitive harm").

We also note that Congress, in an effort to weed out unmeritorious securities lawsuits, has recently tightened the procedural requirements that plaintiffs must satisfy when they file those suits. To permit an antitrust lawsuit risks circumventing these requirements by permitting plaintiffs to dress what is essentially a securities complaint in antitrust clothing. See generally Private Securities Litigation Reform Act of 1995, 109 Stat. 737; Securities Litigation Uniform Standards Act of 1998, 112 Stat. 3227.

In sum, an antitrust action in this context is accompanied by a substantial risk of injury to the securities markets and by a diminished need for antitrust enforcement to address anticompetitive conduct. Together these considerations indicate a serious conflict between, on the one hand, application of the antitrust laws and, on the other, proper enforcement of the securities law.

We are aware that the Solicitor General, while recognizing the conflict, suggests a procedural device that he be-

lieves will avoid it (in effect, a compromise between the differing positions that the SEC and Antitrust Division of the Department of Justice took in the courts below). Compare Brief for Dept. of Justice, Antitrust Division, as *Amicus Curiae* in Case No. 01 CIV 2014, p. 23 (seeking no preclusion of the antitrust laws), with Brief for SEC 39–40, App. D to Pet. for Cert. 155a–157a (seeking total preclusion of the antitrust laws). He asks us to remand this case to the District Court so that it can determine "whether respondents' allegations of prohibited conduct can, as a practical matter, be separated from conduct that is permitted by the regulatory scheme," and in doing so, the lower court should decide whether SEC-permitted and SEC-prohibited conduct are "inextricably intertwined." See Brief for United States as *Amicus Curiae* 9. The Solicitor General fears that otherwise, we might read the law as totally precluding application of the antitrust law to underwriting syndicate behavior, even were underwriters, say, overtly to divide markets.

The Solicitor General's proposed disposition, however, does not convincingly address the concerns we have set forth here—the difficulty of drawing a complex, sinuous line separating securities-permitted from securities-forbidden conduct, the need for securities-related expertise to draw that line, the likelihood that litigating parties will depend upon the same evidence yet expect courts to draw different inferences from it, and the serious risk that antitrust courts will produce inconsistent results that, in turn, will overly deter syndicate practices important in the marketing of new issues. (We also note that market divisions appear to fall well outside the heartland of activities related to the underwriting process than the conduct before us here, and we express no view in respect to that kind of activity.)

The upshot is that all four elements present in *Gordon* are present here: (1) an area of conduct squarely within the heartland of securities regulations; (2) clear and ade-

quate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) a serious conflict between the antitrust and regulatory regimes. We therefore conclude that the securities laws are "clearly incompatible" with the application of the antitrust laws in this context.

The Second Circuit's contrary judgment is

*Reversed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–1157

_____

CREDIT SUISSE SECURITIES (USA) LLC, FKA CREDIT SUISSE FIRST BOSTON LLC, ET AL., PETITIONERS *v.* GLEN BILLING ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2007]

JUSTICE STEVENS, concurring in the judgment.

When investment bankers cooperate in underwriting an initial public offering (IPO), they increase the amount of capital available to firms producing goods and services and make additional securities available for purchase. By agglomerating networks of investors and spreading the risk of overvaluation, syndicates make positive contributions to the economy that could not be achieved through independent action. See 426 F. 3d 130, 137–138 (CA2 2005). In my view, agreements among underwriters on how best to market IPOs, including agreements on price and other terms of sale to initial investors, should be treated as procompetitive joint ventures for purposes of antitrust analysis. In all but the rarest of cases, they cannot be conspiracies in restraint of trade within the meaning of §1 of the Sherman Act, 15 U. S. C. §1.

After the initial purchase, the prices of newly issued stocks or bonds are determined by competition among the vast multitude of other securities traded in a free market. To suggest that an underwriting syndicate can restrain trade in that market by manipulating the terms of IPOs is frivolous. See *United States* v. *Morgan*, 118 F. Supp. 621, 689 (SDNY 1953) (Medina, J.) ("[T]he syndicate system has no effect whatever on general market prices, nor do

the participating underwriters and dealers intend it to have any. On the contrary, it is the general market prices of securities of comparable rating and quality which control the public offering price . . . . The particular issue, even if a large one, is but an infinitesimal unit of trade in the ocean of security issues running into the billions, which constitutes the general market"); see also Hovenkamp, Antitrust Violations in Securities Markets, 28 J. Corp. L. 607, 615–618 (2003). It is possible of course that the practices described in the complaints in these two cases may have enabled the underwriters to divert some of the benefits of the offerings from the issuers to themselves, thus breaching the agents' fiduciary obligations to their principals. But if such an injury did occur, it is not an "antitrust injury" giving rise to a damages claim by investors. See *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 489 (1977).

Nor do I believe that the so-called "laddering" and "tying" described in the complaints constitute vertical restraints that violate either the Sherman Act or §2(c) of the Robinson-Patman Act, 15 U. S. C. §13(c). Given the magnitude of the market these practices are alleged to have influenced, I think it obvious as a matter of law that there has been no injury to any relevant competition. Unlike in *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. ___ (2007), there is no need to engage in discovery to determine whether there is any merit to the plaintiffs' claims. See *id.*, at ___–___ (STEVENS, J., dissenting) (slip op., at 24–26).

The defendants moved to dismiss for failure to state a claim on the ground, among others, that the plaintiffs' claims challenge "the ordinary activities of participants in underwriting syndicates, which are recognized to be completely lawful and pro-competitive." Record, Doc. 98, p. 72. I agree and would hold, as we did in *Parker* v. *Brown,* 317 U. S. 341, 351–352 (1943), that the defendants' alleged conduct does not violate the antitrust laws, rather

than holding that Congress has implicitly granted them immunity from those laws. Surely I would not suggest, as the Court did in *Twombly*, and as it does again today, that either the burdens of antitrust litigation or the risk "that antitrust courts are likely to make unusually serious mistakes," *ante*, at 16, should play any role in the analysis of the question of law presented in a case such as this.

Accordingly, I concur in the Court's judgment but not in its opinion.

# SUPREME COURT OF THE UNITED STATES

No. 05–1157

CREDIT SUISSE SECURITIES (USA) LLC, FKA CREDIT SUISSE FIRST BOSTON LLC, ET AL., PETITIONERS *v.* GLEN BILLING ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 18, 2007]

JUSTICE THOMAS, dissenting.

The Court believes it must decide whether the securities laws implicitly preclude application of the antitrust laws because the securities statutes "are silent in respect to antitrust." See *ante*, at 5. I disagree with that basic premise. The securities statutes are not silent. Both the Securities Act and the Securities Exchange Act contain broad saving clauses that preserve rights and remedies existing outside of the securities laws.

Section 16 of the Securities Act of 1933 states that "the rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist in law or in equity." 15 U. S. C. §77p(a). In parallel fashion, §28 of the Securities Exchange Act of 1934 states that "the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." §78bb(a). This Court has previously characterized those clauses as "confirm[ing] that the remedies in each Act were to be supplemented by 'any and all' additional remedies." *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 383 (1983).

The Sherman Act was enacted in 1890. See 26 Stat. 209. Accordingly, rights and remedies under the federal antitrust laws certainly would have been thought of as

"rights and remedies" that existed "at law or in equity" by the Congresses that enacted that Securities Act and the Securities Exchange Act in the early 1930's.  See §77p; §78bb.  Therefore, both statutes explicitly save the very remedies the Court holds to be impliedly precluded.  There is no convincing argument for why these saving provisions should not resolve this case in respondents' favor.

The Court's opinion overlooks the saving clauses seemingly because they do not "explicitly state whether they preclude application of the antitrust laws."  *Ante*, at 4; see also Brief for Petitioners 33, n. 5.[1]  As the Court observes, some statutes contain saving clauses specific to antitrust.  See, *e.g.*, *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398, 406 (2004) (quoting Telecommunications Act of 1996, §601(b)(1), 110 Stat. 143, note following 47 U. S. C. §152 ("'[N]othing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws'")).  But the mere existence of targeted saving clauses does not demonstrate—or even suggest— that antitrust remedies are not included within the "any and all" other remedies to which the securities saving clauses refer.  Although Congress may have singled out antitrust remedies for special treatment in some statutes, it is not precluded from using more general saving provisions that encompass antitrust and other remedies.  Surely Congress is not required to enumerate every cause

---

[1] The Court suggests that the argument advanced in my opinion was not preserved by the respondents.  See *ante*, at 9.  Respondents' principal contention in the Court of Appeals below was that "[t]he federal securities laws do not expressly immunize Defendants' alleged conduct from prosecution under the federal antitrust laws."  See, *e.g.*, Brief for Appellants in No. 03–9288 (CA2), pp. 15–16.  Because a full reading of the securities laws is essential to analyzing respondents' central argument, I do not consider arguments based on the saving clauses unpreserved.  Cf. *United States* v. *Morton*, 467 U. S. 822, 828 (1984) ("[W]e read statutes as a whole").

of action—state and federal—that may be brought. When Congress wants to preserve all other remedies, using the word "all" is sufficient.

Petitioners also argue that the saving clauses should not apply because the clauses did not play a role in the Court's prior securities-antitrust pre-emption cases. Brief for Petitioners 33, n. 5 ("[N]either provision was found to bar immunity in *Gordon* [v. *New York Stock Exchange, Inc.,* 422 U. S. 659 (1975)] or *[United States* v. *National Assn. of Securities Dealers, Inc.,* 422 U. S. 694 (1975) *(NASD)]*"). Be that as it may, none of the opinions in *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963), *Gordon,* or *NASD*—majority or dissent—offered any analysis of the saving clauses. Omitted reasoning has little claim to precedential value. Absent any indication that these omissions were the product of reasoned analysis instead of inadvertent oversight, I would not allow the Court's prior silence on this issue to erect a perpetual bar to arguments based on a full reading of the statute's relevant text.

Finally, it might be argued that the saving clauses preserve only state-law rights and remedies. This argument has no textual basis. If Congress had intended to limit the clauses to state law, it surely would not have phrased them to preserve *"any and all"* rights and remedies. Other provisions in both Acts, including a later sentence in the section containing the Securities Exchange Act's saving clause, suggest that Congress explicitly referred to States when it intended to impose a state-law limitation. See, *e.g.*, 15 U. S. C. §77v(a) (referring to "State and Territorial courts"); §78bb(a) (referring to the "securities commission . . . of any State"); cf. 17 U. S. C. §301(b) ("Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State . . ."). Given Congress' demonstrated ability to limit provisions of the securities laws to States and the lack of any such limitation here, the saving clauses cannot

be understood as limited only to state-law rights and remedies.[2]

A straightforward application of the saving clauses to this case leads to the conclusion that respondents' anti-trust suits must proceed. Accordingly, we do not need to reconcile any conflict between the securities laws and the antitrust laws. I respectfully dissent.

-------------------

[2] The Court's suggestion that the clauses were intended to save only securities-related rights and remedies is subject to many of the same criticisms. See *ante*, at 9. The Securities Act of 1933 provided no private federal remedy for fraud in the purchase or sale of registered securities. On the Court's proposed reading of §77p, however, a federal action for mail or wire fraud and a state-law action for fraud, which are not securities-related rights or remedies, would not have been included within the Securities Act's saving provision.